## In re KIDDER PEABODY SECURITIES LITIGATION.

### No. 94 Civ. 3954(BSJ).

United States District Court,
S.D. New York.

July 6, 1998.

Richard Bemporad, Jeanne F. D'Esposito, Lowey, Dannenberg, Bemporad & Selinger, P.C., New York City, for Plaintiffs.

Robert F. Wise, Jr., Lawrence J. Portnoy, Laura A. Lopez, Davis, Polk & Wardwell, New York City, for Defendant Kidder Peabody & Co., Inc. and Kidder Peabody Group, Inc.

David M. Brodsky, Daniel J. Kramer, David K. Momborquette, Schulte, Roth & Zabel, New York City, for Defendant Michael A. Carpenter.

Raymond Banoun, Richard A. McGuirk, Cadwalader, Wickersham & Taft, New York City, for Defendant Richard W. O'Donnell.

Henry B. Gutman, Eric S. Kobrick, Simpson, Thacher & Bartlett, New York City, for Defendant Edward A. Cerullo.

Kenneth E. Warner, Lewis S. Fischbein, Coblance & Warner, New York City, for Defendant Orlando Joseph Jett.

## MEMORANDUM & ORDER

JONES, District Judge.

This consolidated class action arises from allegations that a trader at defendant Kidder, Peabody & Co., Inc. ("Kidder") engaged in an ongoing scheme from late 1991 until April 1994 to generate false profits through the use of phantom trades. At the time of the alleged scheme, Kidder was a wholly-owned subsidiary of General Electric Company ("GE"). Following disclosure of the scheme, plaintiffs, shareholders of GE who purchased GE common stock between February 26, 1993, and April 15, 1994, commenced this action. Plaintiffs allege that Kidder, its holding company, defendant Kidder, Peabody Group, Inc. ("Kidder Group"), and four employees of Kidder, including the trader directly responsible for generating the false profits, violated the Securities Exchange Act of 1934 by making or causing to be made public statements that incorporated the false profits.[1]

Plaintiffs' complaint originally pled twenty-four allegedly false or misleading public statements. Of these, thirteen had been made by GE in public filings, reports and press releases, five had been made by securities analysts, and one had been made by former New York City Mayor David Dinkins. The remaining five statements had been made directly by Kidder or by a Kidder employee.

On October 4, 1995, the Court denied defendants' motions to dismiss the complaint. *In re Kidder Peabody Sec. Litig.*, 1995 WL 590624 (S.D.N.Y. 1995) (*"Kidder I"*). As part of that decision, however, the Court agreed with defendants that they could not be held liable for statements attributed to GE or to other third parties. *Id.* at *4. Accordingly, the Court dismissed the claims based on those statements, leaving in the case only the five statements directly attributable to Kidder or Kidder's employees. *Id.*

Currently pending are defendants' motions for summary judgment, pursuant to Fed. R.Civ.P. 56. Defendants Kidder, Kidder Group, Michael A. Carpenter ("Carpenter"), Richard W. O'Donnell ("O'Donnell"), Edward A. Cerullo ("Cerullo"), and Orlando Joseph Jett ("Jett") join in arguing for summary

---

1. A related consolidated class action was filed against GE. That action was dismissed by the Court on October 4, 1995. *See In re General Elec. Sec. Litig.*, 1995 WL 590639 (S.D.N.Y. 1995), *aff'd sub nom. Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir.1996).

judgment on the ground that plaintiffs cannot prove, as a matter of law, that any of the allegedly false statements were material. All of the defendants, except for Jett, also argue for summary judgment on the ground that plaintiffs cannot prove, as a matter of law, that they acted with the requisite scienter. In addition, Cerullo argues that he is entitled to summary judgment because plaintiffs cannot prove that he was personally responsible for any of the allegedly false statements or that he owed a duty to GE's shareholders.

Also pending is plaintiffs' application to reinstate the thirteen statements attributed to GE and the five statements attributed to securities analysts, which previously were dismissed by the Court. Plaintiffs argue that defendants should be held liable for these statements because defendants were directly responsible for making them, using GE and the analysts as conduits for materially false information.

## BACKGROUND

The following facts are not in dispute unless otherwise noted.

### I. *Kidder's Organizational Structure and Relationship to GE*

At all relevant times, Kidder was a registered securities broker-dealer and full-service investment bank, and a wholly owned subsidiary of Kidder Group, a holding company for several related businesses. Kidder's businesses included securities underwriting, sales and trading of equity and fixed income securities, corporate finance advisory services, and retail brokerage and asset management.

During the class period, Carpenter served as Kidder's Chairman of the Board of Directors and Chief Executive Officer. Below Carpenter was O'Donnell, who served as Kidder's Chief Financial and Administrative Officer. O'Donnell's responsibilities included overseeing Kidder's operations and its audit and credit functions.

Kidder's relationship with GE began in April 1986, when GE purchased Kidder for $602 million. From then until late 1994,[2] Kidder, through Kidder Group, was a wholly-owned subsidiary of GE Capital Services ("GECS"). GECS, in turn, was a wholly-owned subsidiary of GE, functioning as GE's financial services unit.

GE is engaged in a wide variety of businesses including lighting, appliances, aircraft engines, broadcasting (through NBC), plastics, medical equipment, and power generation. Unlike Kidder, Kidder Group, or GECS, GE is a publicly held company, with its common stock traded on the New York Stock Exchange ("NYSE"). Consistent with its duties as a publicly held company, and pursuant to rules promulgated by the Securities Exchange Commission ("SEC"), GE makes regular public disclosure of its financial statements. During the relevant time period, GE's statements included financial information related to Kidder.

During the class period, Kidder's most dominant business unit was the Fixed Income Division, which was headed by Cerullo.[3] According to plaintiffs, this division accounted for the great majority of Kidder's net income and approximately 90% of the book value of Kidder's assets.

The Fixed Income Division consisted of twelve trading desks, including the Government Securities Desk. In July 1991, Jett was hired by Kidder to trade at this desk. It was from this desk that Kidder's false profits originated over the next two and a half years.

### II. *Trading of Treasury Bonds*

Kidder's Government Securities Desk traded in bonds issued by the United States Treasury. As traded on the secondary market, each bond consists of separate components, representing fixed interest and principal payments. Individually, these components are known as "STRIPS," for "Separate Trading of Registered Interest and Principal of Securities." Collectively, these STRIPS constitute a completed bond.

---

**2.** GE no longer owns Kidder, having sold Kidder to PaineWebber Inc. in late 1994.

**3.** Cerullo also served on the Board of Directors for Kidder and on the Kidder Group Management Committee, which was chaired by Carpenter.

Due to the time value of money, in trading with consumers, a STRIPS security will sell for less than its final payment value. This is because the present value of the right to receive a future payment is less than the value of receiving that payment immediately. Generally, the greater the length of time between purchase date and final payment date, the greater the gap between current price and final value. The converse is also true: As the payment date approaches the price of a STRIPS security will increase, until payment date, when the two values converge.

Purchasers and dealers of STRIPS seek to profit on shifts in interest rates and demand that occur between the sale date of a STRIPS security and its payment date. Dealers also can make profits through "arbitrage," exploiting small, temporary price discrepancies between bonds and the component STRIPS. Thus, if the demand for individual STRIPS on any given day is higher than their current market value as a fully reconstituted bond, a dealer may be able to make a profit by stripping a bond and selling the individual components.

To facilitate the trading of government bonds, the Federal Reserve Board ("Federal Reserve"), acting as agent for the United States Treasury, stands ready at any time to exchange a bond for its individual STRIPS, or vice versa. The exchange of a full set of STRIPS for a bond is known as a "reconstitution" or "recon." The opposite exchange, of a bond for its individual STRIPS, is known as a "strip."

Unlike the sale of STRIPS or bonds to consumers, the exchange of STRIPS for bonds (or bonds for STRIPS) between a broker-dealer and the Federal Reserve has no economic significance. Such an exchange is merely a non-cash trade of economically equivalent securities, much like the exchange of one $100 bill for five $20 bills. Only the Federal Reserve can execute a strip or recon exchange and the Federal Reserve does not arrange, agree to, or confirm such exchanges in advance.

4. Mullin is not a defendant in this action.

## III. Jett Begins to Trade

Although Jett had never traded in government securities, Kidder hired him, according to Jett, to reestablish profitability on the Government Securities Desk. Kidder expected Jett to make profits in part by dealing in STRIPS with customers and through opportunities for arbitrage. According to Melvin Mullin ("Mullin")[4], Jett's first supervisor at Kidder, when Jett started in 1991 strip and recon arbitrage with customers could result in "profit opportunities in the range of $2000 per million." Such opportunities arose from "doing trades with customers to capture the price differences."

Jett's initial performance at Kidder was "fairly slow," according to Mullin. In August 1991, Jett lost money; the following two months he made only small profits of $229,000 and $275,000. These profits were far less than the $1 million in profits per month that Cerullo and Mullin expected Jett to generate from his trading activities. As a result, at the end of October, Kidder categorized Jett's performance as "Improvement Desirable," giving Jett the second lowest rating on Kidder's five-point performance scale.

Towards the end of 1991, however, Jett's performance appeared to turn around, with reported profits of $500,000 in November. After a dip in December, Jett exceeded his $1 million target for the first time with reported profits of almost $1.2 million in January 1992. His reported profits continued to grow throughout 1992, reaching a high of $4.86 million in July. In total, Jett reported profits of $32.481 million for 1992. For these efforts, Jett was awarded a year-end performance bonus of $2 million and promoted to Senior Vice President.

In fact, Jett's trading had resulted in actual losses of $7.943 million.[5] These real losses had been cloaked by the reporting of $40.424 million in false profits. The source of these false profits was "forward recons" with the Federal Reserve that Jett had begun to enter in November 1991.

5. With the exception of Jett, all of the parties agree that Jett was generating false profits that were disguising actual losses.

A "forward recon" is simply a reconstitution entered for settlement more than one business day forward; in other words, a promise on day one to reconstitute a bond at some time in the future. As explained above, a "recon"—where a trader exchanges a complete set of STRIPS for a bond of equivalent value—has no economic impact, and involves no exchange of capital. Likewise, a forward recon has no economic impact; it is merely a promise to exchange economically equivalent securities in the future.

Nevertheless, due to the way Kidder's computerized trading and accounting systems had been set up, when a trader such as Jett entered a forward recon, the computer would treat the transaction as an immediate sale of STRIPS securities. This would result in the appearance of a profit, because the present "sale" price of the STRIPS would be lower than its ultimate payment value. Put differently, Kidder's computer would take the difference between the current price of the STRIPS and the forward price of the STRIPS and record that difference as an immediate profit. The larger the bond to be reconstituted or the farther forward the settlement date, the larger the apparent profit. In reality, this profit was illusory and there was no legitimate purpose or economic reality behind the entry of forward recons into the computer. At no point was there any exchange or receipt of capital.

Moreover, for the same reason the computer would generate a false profit on day one, as the settlement date for the recon approached, the computer would generate a corresponding false loss. In other words, as the current value of the STRIPS converged with its payment value, the apparent profit decreased, generating an offsetting false loss. By settlement date, the original false profit would be eliminated. As a result, to continue the illusion of profits, a trader would have to continue to enter more and more forward recons, with more and more distant settlement dates.

And this is just what Jett began to do. After entering 142 recons and strips in 1991, Jett entered 1039 for 1992. That number grew to 2398 in 1993, and to 1997 for the first quarter of 1994. Jett also started to enter forward recons with increasingly distant settlement dates. Prior to November 1992, the longest settlement date Jett could enter on Kidder's computers was five business days. After November, however, a change in Kidder's computer entry options allowed Jett to enter any future settlement date he wanted. This enhanced Jett's ability to foster the illusion of profits, with Jett entering forward recons with settlement dates as much as 203 days forward; twelve times he entered forward recons with settlement dates of more than 115 days forward.

By using forward recons, Jett's reported profits in 1993 grew to over $10 million for every month starting with March. In September alone, Jett reported profits of over $21 million. In total, for 1993, Jett reported profits of $150.654 million. For his efforts, Jett was named Kidder Man of the Year and awarded a year-end performance bonus of over $9 million.

In fact, Jett's use of forward recons in 1993 had resulted in the reporting of $198.182 million in false profits. This had masked an actual trading loss by Jett of $47.528 million.

The use of forward recons continued into 1994, with Jett reporting profits of $35.813 million for January, $30.094 million for February, and $14.193 million for March. Again, these reported profits were illusory, with Jett's forward recons generating $99.837 million of false profits for the first three months of 1994. This masked actual trading losses of $19.737 million.

In total, by the end of March 1994, Jett's trading had generated $338.698 million in false profits. He had not reported a loss for any month since December 1991 and had reported at least a $10 million profit for every month in the preceding year. In reality, Jett's phantom trades had masked $74.676 million in losses.

To put Jett's reported profits in perspective, prior to Jett's employment, according to plaintiffs, the previous record at Kidder for profits on STRIPS trading was approximately $15 million for an entire year. Jett had exceeded that mark within just one month four times—in March and September 1993

and in January and February 1994. On one transaction alone—a forward recon entered on November 17, 1992, for a $200 million bond scheduled to settle on June 8, 1993—Jett generated an apparent profit of $12.9 million. On another—a January 21, 1994 forward recon for a $800 million bond scheduled to settle on April 25, 1994—Jett generated an apparent profit of $24.2 million. Since starting to enter forward recons Jett had never reported a losing month.

## IV. Effect of the False Profits on Kidder's Reported Earnings

In the five years preceding Jett's hiring, Kidder reported net operating losses in at least three years.[6] In 1991, however, Kidder reported an operating profit of $119 million. The following years, Kidder's reported profits increased to $300 million in 1992 and $439 million in 1993.

In reality, these figures incorporated the false profits generated from Jett's trading activities. Thus, in 1992, Kidder's profits were inflated by approximately 13.5%. In 1993, Kidder's profits were inflated by approximately 45%. And, as mentioned above, these profits were reported in public disclosures made by GE.

## V. Disclosure

Jett's trading at Kidder finally came to end in April 1994. For reasons in dispute, on or about April 14, 1994, officials at Kidder notified regulators and GE that they had confirmed the existence of up to $350 million in false profits. On Sunday, April 17, 1994, GE and Kidder issued separate press releases disclosing the false profits. GE announced that it was taking a one-time, non-cash charge of $210 million ($350 million pre-tax) against its first quarter earnings. Kidder did the same. Kidder further announced that Jett had been fired.

**6.** Plaintiffs allege that Kidder reported losses for every year from 1986 to 1991. However, this allegation is based only on an unsubstantiated statement from an expert retained by plaintiffs to analyze this case. In contrast, GE's Annual Reports, submitted by Kidder, support defendants' claim that Kidder lost $23 million in 1987, $53 million in 1989, and $54 million in 1990, but reported profits of $83 million in 1986 and $64 million in 1988.

The next day, Monday, April 18, GE's stock closed at $94.875, with a trading volume of 1.8 million shares. This was down $1.875, or 1.94%, from the stock's closing price of $96.75 on Friday, April 15. According to plaintiffs' calculation, as a result of this decrease, by week's end GE had suffered a market capitalization loss of approximately $1.6 billion.

In the months that followed, Kidder's legal department conducted a preliminary inquiry. Subsequently, the SEC commenced an investigation that led to enforcement proceedings against Cerullo, Mullin and Jett.[7] The United States Attorney's Office and the NYSE also conducted separate investigations.

In June 1994, Carpenter resigned from Kidder. One month later, Cerullo resigned as well. O'Donnell left his position in January 1995.

On or about October 7, 1994, plaintiffs filed their Consolidated Amended Class Action Complaint, seeking total damages of more than $228 million. In Count I, plaintiffs allege that all of the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder. In Count II, plaintiffs allege that all of the defendants except for Kidder violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), by acting as "controlling persons."

## DISCUSSION

The Court's discussion begins with plaintiffs' application to reinstate the thirteen statements attributed to GE and the five statements attributed to securities analysts, which previously were dismissed by the Court. The Court then will turn to defendants' motions for summary judgment.

**7.** Cerullo and Mullin subsequently settled with the SEC.

## I. Plaintiffs' Application

As explained above, while denying defendants' motions to dismiss the complaint, the Court agreed with defendants that they could not be held liable for statements attributed to GE or to securities analysts. *Kidder I,* 1995 WL 590624, at *4. Plaintiffs now seek reconsideration of these rulings.

### A. Statements Attributed to GE

■ In dismissing the statements attributed to GE, the Court relied on *Ivers v. Keene Corp.,* 780 F.Supp. 185 (S.D.N.Y.1991). In *Ivers,* the court ruled that a subsidiary company could not be held primarily liable for alleged misstatements made by its parent because the subsidiary did not owe a fiduciary duty to the parent's shareholders. *Id.* at 188. Instead, where the subsidiary may have been responsible for false information disseminated by its parent, the proper avenue for relief was under an aider and abettor theory of liability. *Id.* at 189–90.

Subsequent to *Ivers,* however, the framework for considering § 10(b) securities violations changed dramatically. In *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court held that there was no cause of action for aiding and abetting under § 10(b) or Rule 10b–5. This decision effectively abrogated 25 years of caselaw, as well as precedent from eleven federal courts of appeals. *See In re Leslie Fay Cos. Sec. Litig.,* 871 F.Supp. 686, 689–90 (S.D.N.Y. 1995) (collecting decisions of eleven circuits that had recognized aiding and abetting lia-

bility). It also placed the *Ivers*-type situation in a very different context.[8]

■ Having reviewed *Central Bank* and the cases that followed that decision, the Court now concludes that the statements attributed to GE should be reinstated.[9]

■ As an initial matter, the Supreme Court in *Central Bank,* in rejecting aiding and abetting liability, made clear that it did not intend to insulate all "secondary actors in the securities markets" from liability. *Central Bank,* 511 U.S. at 191, 114 S.Ct. 1439. Indeed, as the Court found and the Second Circuit recently reiterated, such actors remain liable under § 10(b) if the requirements for primary liability are met. *Id.; see also Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 842–43 (2d Cir.1998) ("secondary actors who conspire to commit such violations will still be subject to liability so long as they independently satisfy the requirements for primary liability").

■ To establish primary liability under § 10(b), a plaintiff must prove that in connection with the purchase or sale of a security, the defendant, acting with scienter, made a material misrepresentation, and that the plaintiff relied on that misrepresentation to his or her detriment. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993), *cert. denied,* 511 U.S. 1017 (1994).

■ Turning to this case, at first blush this analysis would seem to foreclose defen-

---

**8.** Although Central Bank had been decided by the time the Court issued its earlier opinion, the Court did not have the benefit of nearly three years of subsequent opinions discussing the parameters of primary liability following *Central Bank.*

**9.** Insofar as the Court based its earlier decision on a fiduciary duty analysis, the Court now concludes that such an analysis has no bearing on whether defendants may be held primarily liable for the statements attributed to GE. Fiduciary duty analysis arises in securities cases only where a claim is based on alleged omissions. *See Central Bank,* 511 U.S. at 174, 114 S.Ct. 1439; *Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *In re Canandaigua Sec. Litig.,* 944 F.Supp. 1202,

1208 (S.D.N.Y.1996). In contrast, here plaintiffs allege not omissions but rather affirmative misstatements.

This conclusion is not inconsistent with *Ivers,* if *Ivers* is read as an omissions case. In *Ivers,* the subsidiary had allegedly "failed to disclose" that a large portion of its insurance coverage was subject to litigation and that much of its coverage was imperiled by the insolvency of its insurance companies. *Ivers,* 780 F.Supp. at 189–90. In that situation, the subsidiary did not have an affirmative duty to disclose facts that would have corrected misstatements made by its parent. This is very different from the situation alleged in this case, where defendants allegedly used GE as a conduit for their affirmative misstatements.

dants' liability for statements attributed to GE. However, as a number of cases since *Central Bank* have made clear, that the defendant must make a misrepresentation does not mean that the defendant must communicate that misrepresentation directly to the plaintiff. *See Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997) (defendant " 'cannot escape liability simply because it carried out its alleged fraud through the public statements of third parties' "(quoting *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir. 1996))); *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1226 (10th Cir.1996) ("there is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach"); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1120 (W.D.Mich. 1996); *see also SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1471 (2d Cir.1996) ("Primary liability may be imposed not only on persons who made fraudulent representations but also on those who had knowledge of the fraud and assisted in its preparation." (internal quotation marks and citation omitted)), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *In re MTC Elec. Techs. Shareholder Litig.,* 993 F.Supp. 160, 162 (E.D.N.Y.1997) (citing *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 370 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231 (1973)); In re *ICN/Viratek Sec. Litig.,* 1996 WL 164732, at *6–7 (S.D.N.Y. 1996) (company may be primarily liable for statements made by analyst where company so entangled itself with statement that statement could be properly attributed to company). Rather, where the defendant has made a misstatement but used another actor to deliver the message, the defendant still may be liable as a primary violator. *See Perrigo Co.,* 940 F.Supp. at 1120. "In such circumstances, it was the defendant's original statement which misled investors—the person who communicated the statement to investors served as a mere conduit for [the] defendant's statement." *Id.*

Thus, if plaintiffs can show that defendants were the original and knowing source of a misrepresentation and that defendants knew or should have known that misrepresentation would be communicated to investors, primary liability should attach. *See Anixter,* 77 F.3d at 1226; *Perrigo Co.,* 940 F.Supp. at 1120.

Here, plaintiffs allege that defendants were the "original and knowing source" of the alleged misrepresentations of Kidder's earnings, which were conveyed to investors by GE in public filings, reports and press releases. There is no dispute that Kidder provided GE with financial data on a quarterly basis and that that data was incorporated in GECS's financial statements and GE's quarterly and annual reports. *See* Stipulation and Order dated September 16, 1997, submitted as Plaintiffs' Ex. 183, ¶¶ 3–6. As a subsidiary of GE, and as a sophisticated investment banking and securities firm, it is reasonable to infer that Kidder knew this information would reach securities analysts, GE stockholders and others in the investment community.

Also undisputed is that GE's role in disseminating this information was limited to serving as a conduit. GE believed that the information provided by Kidder accurately reflected Kidder's financial performance. *See id.* ¶ 9. GE apparently did nothing more than collect the information and transcribe it onto the page. Kidder controlled the content of the information. When GE opened its mouth regarding Kidder, Kidder's words came out.

Given these facts, it is clear that defendants should be held liable for GE's statements if the other requirements of primary liability are met.

In reaching this conclusion, the Court notes that the securities laws embrace a " 'fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor.' " *First Jersey,* 101 F.3d at 1466 (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). Insulating securities violations from liability merely because an actor succeeded in conveying his message through another source would be contrary to the basic theory that in "a natural, unrigged market ... 'competing judgments of buyers and sellers as to the fair price of the security brings about a situation where the market price reflects as nearly as possible a just

price.'" *Id.* (quoting H.R.Rep. No. 1383, 73rd Cong., 2d Sess., at 11 (1934)).

Moreover, holding a subsidiary immune from liability for statements communicated by its parent under these facts would lead to an anomalous result. A subsidiary could freely disseminate false information to the market through its parent, but investors relying on that information to their detriment would be left with no remedy: an action could not be brought against the subsidiary, and the parent would escape liability because it lacked scienter. This "would lead to a result 'so bizarre' that Congress could not have intended it."*Central Bank*, 511 U.S. at 188, 114 S.Ct. 1439; *see also, ICN/Viratek*, 1996 WL 164732, at *6 (discussing same anomaly in context of corporation using analyst to disseminate false information). This is precisely the situation facing plaintiffs in this case, where the lawsuit against GE was dismissed because plaintiffs' allegations against GE failed to establish scienter. *See Chill v. General Elec. Co.*, 101 F.3d 263, 270–71 (2d Cir.1996).

In short, in the wake of *Central Bank*, the Court has become convinced that the thirteen statements attributed to GE in the complaint should be reinstated. While defendants may have been secondary actors, their actions, as alleged, make out a claim for primary liability. Accordingly, plaintiffs' application with respect to the statements attributed to GE is granted.[10]

### B. Statements Attributed to Analysts

■ The five statements attributed to securities analysts fall into a different category.

While a company may be held liable as a primary wrongdoer "if it has so 'entangled itself' with the issuance of an analyst's report that the statements of the report may in effect, be attributed to the company," *ICN/Viratek*, 1996 WL 164732, at *3 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir.1980)), here plaintiffs have

not alleged that defendants had any direct involvement in generating any of the analysts' reports. At most, defendants provided GE with information that GE, in turn, conveyed to the analysts at the analysts' requests. For two of the analysts' reports, plaintiffs have submitted no evidence as to the source of the analysts' information, instead relying on an assumption that the analysts based their information on data given to GE by Kidder. This is not a situation where defendants reached out to the analysts, reviewed the information as reported by the analysts or otherwise implicitly ratified the analysts' information as true.

Based on this evidence, as submitted by plaintiffs after lengthy discovery, the Court finds as a matter of law that plaintiffs cannot prove sufficient entanglement by Kidder in the analysts' statements. Accordingly, these statements will not be reinstated.[11]

### II. Defendants' Motions for Summary Judgment

The Court now turns to defendants' motions for summary judgment. The Court's discussion begins with defendants' claim that the misstatements alleged by plaintiffs are immaterial as a matter of law. The Court then will turn to the issue of scienter, as raised by each of the defendants, except Jett. Finally, the Court will address Cerullo's individual arguments for summary judgment.

### A. Standard for Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the Court must resolve all ambiguities in the light most favorable to the non-moving party and draw all reasonable inferences in the nonmoving party's favor. *See Wernick v. Federal Reserve Bank*, 91 F.3d 379, 382 (2d Cir.1996); *Dela-*

---

**10.** To clarify, these statements are pled in the Consolidated Amended Complaint ("Compl.") at paragraphs 36–41, 44–46, 48, 52, 55, and 56.

**11.** The Court does not understand plaintiffs to be seeking reinstatement of the alleged misstate-

ment attributed to Mayor Dinkins. Were the Court to reconsider this statement, the Court would decline to reinstate it because there is no evidence tying defendants to the statement.

*ware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). It is the non-moving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992).

"A fact is material when its resolution would 'affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *General Elec. Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### B. *Materiality*

Defendants join in arguing that all of the alleged misstatements are immaterial as a matter of law. In support, defendants offer four main arguments: (1) none of the alleged misstatements as to profits amounted to a significant percentage of GE's total earnings; (2) any statements made before or after the class period are immaterial as a matter of law; (3) statements made in "FOCUS Reports" would not have been considered by reasonable investors; and (4) at least some of the statements are demonstrably true. After laying out the relevant standard, the Court will address each of these arguments separately.

#### 1. *Materiality Under § 10(b) & Rule 10b–5*

■ Under § 10(b) and Rule 10b–5, a misstatement or omission is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"*Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In other words, there must be a substantial likelihood that disclosure of the information in question "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32, 108 S.Ct. 978.

■ While materiality requires a showing that the misstated or omitted fact "would have assumed actual significance in the deliberations of the reasonable shareholder," it does not require a showing that such fact would have been outcome-determinative. *See TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126; *Folger Adam Co. v. PMI Indus., Inc.,* 938 F.2d 1529, 1533 (2d Cir.1991). A fact may be material even if it would not have changed an investor's ultimate investment decision. *See TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126; *Folger Adam,* 938 F.2d at 1533–34.

■ Materiality is a mixed question of law and fact that is generally particularly well-suited for jury determination. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126 ("The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994); *Mendell v. Greenberg,* 927 F.2d 667, 673 (2d Cir.1990). Summary judgment may be granted only where the alleged misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Azrielli,* 21 F.3d at 518; *see also Mendell,* 927 F.2d at 676 ("Summary judgment dismissing a claim alleging a material omission is granted only when to disagree on the materiality of the omission would be unreasonable.").

Here, the gist of plaintiffs' fraud allegations is that defendants significantly overstated Kidder's profits and, in turn, falsified GE's earnings by incorporating the phantom profits generated by Jett's forward recons. In response, defendants maintain that any alleged misstatements were immaterial as a matter of law to a reasonable GE investor.

#### 2. *Defendants' Quantitative Argument*

■ Defendants' primary argument on materiality is that none of the alleged misstatements can be considered material given the amount of the alleged false profits in

relation to GE's total earnings. In support of this argument, defendants note that none of the alleged misstatements, taken individually, affected GE's profits by more than 2.54%, with most of the alleged misstatements individually affecting GE's profits by less than 1%.[12]

Despite the appeal of defendants' statistical approach, drawing all inferences in plaintiffs' favor, the Court concludes that a reasonable trier of fact could find that the alleged misstatements were material to a GE investor.

Initially, the Court notes that the alleged misstatements involved reporting of false profits. Profit statements generally will be of particular interest to investors. After all, by their very nature, financial reports are relevant to investment decisions, with reports of current and past earnings likely to aid in predicting future earnings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 n. 9 (3d Cir.1997). "Indeed, earnings reports are among the pieces of data that investors find most relevant to their investment decision." *Id.* Such information "is likely to be highly 'material'" and of particular importance to the market. *Id.* (citations omitted).

As such, the Court is hard-pressed to find that misstatements of profits totaling over $338 million dollars are immaterial as a matter of law. Each of the alleged misstatements involved millions of dollars, and the misstatements involving year-end profits for 1992 and 1993 exceeded $40 million and $198 million, respectively. Unquestionably these misstatements would have had additional significance if GE had been a smaller company, but this does not mean that such statements were immaterial as a matter of law to a reasonable GE investor.

Moreover, the Court declines to adopt a statistical bright line rule to determine what a reasonable investor would consider significant. *See Basic,* 485 U.S. at 236 n. 14, 108 S.Ct. 978 (" 'Although ... ideally it would be desirable to have absolute certainty in the application of the materiality concept ... such a goal is illusory and unrealistic. The materiality concept is judgmental in nature and it is not possible to translate this into a numerical formula.' "(quoting House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on Corporate Disclosure to the Securities and Exchange Commission, 95th Cong., 1st Sess., 327 (Comm. Print 1977))); *Ross v. Warner,* 1980 WL 1474, at *8 (S.D.N.Y.1980) (declining to grant summary judgment on grounds of materiality despite fact that improper payments represented small percentage of corporation's assets and income). Rather, to determine the effect of the alleged misstatements on the "total mix" of information available, the Court must view the misstatements in the context of what a reasonable investor would have considered important at the time.

Here, plaintiffs have put forth several theories for why a reasonable GE investor would have placed particular emphasis on information related to Kidder. Either of at least two of these theories suffice to raise a genuine issue of material fact.

12. An April 13, 1992 press release by GE allegedly overstated GE's earnings by .394% (Compl.¶36); an August 12, 1992 SEC filing by GE allegedly overstated GE's earnings by .071% (Compl.¶39); an October 13, 1992 press release by GE allegedly overstated GE's earnings by .52% (Compl.¶40); a November 11, 1992 SEC filing by GE allegedly overstated GE's earnings by .52% (Compl.¶41); a December 9, 1992 interview attributed to Carpenter allegedly would have overstated GE's earnings by .519% (Compl.¶42); a February 26, 1993 SEC filing by Kidder allegedly would have overstated GE's earnings by .02% (Compl.¶43); a February 26, 1993 financial report issued by GE to its shareholders allegedly overstated GE's earnings by .524% (Compl.¶44); a May 17, 1993 SEC filing by GE allegedly overstated GE's earnings by .49% (Compl.¶45); an August 16, 1993 SEC filing by GE allegedly overstated GE's earnings by 1.96% (Compl.¶48); a November 15, 1993 SEC filing by GE allegedly overstated GE's earnings by 2.4% (Compl.¶52); a February 25, 1994 SEC filing by Kidder allegedly would have overstated GE's earnings by .924% (Compl.¶54); a February 28, 1994 financial report issued by GE to its shareholders allegedly overstated GE's earnings by 2.54% (Compl.¶55); an April 12, 1994 report that attributed statements to Carpenter allegedly would have overstated GE's earnings by .22% (Compl.¶57); and an April 1994 article that quoted Kidder officials allegedly would have overstated GE's earnings by 2.54%. The remaining alleged misstatements (Compl. ¶¶ 37, 38, 46, and 56) did not refer to specific profits.

First, while the false profits may have been minor compared to GE's earnings as a whole, they were quite significant to Kidder, accounting for 13.5% of Kidder's reported profits in 1992 and 45% in 1993. Kidder's profits, in turn, represented a significant portion of GE's balance sheet. Buffeted by the false profits, Kidder's total profits accounted for 7% of GE's reported earnings in 1993, up from 5% in 1992 and 2% in 1991. As a result, news about Kidder may have held special interest to a GE investor. Put differently, $338 million of false profits attributed solely to Kidder might have had greater significance to an investor than the same $338 million dispersed broadly throughout GE's balance sheet.

Second, the false profits might have been especially important to investors due to Kidder's visible role in GE's business. Under this theory, the importance of reports related to Kidder was magnified because investors had been monitoring Kidder's performance closely since GE purchased Kidder in 1986. In support of this theory, plaintiffs note that when GE announced the purchase of Kidder some analysts believed that the purchase would have a detrimental impact on GE's stock. These analysts felt that GE's inexperience in the securities brokerage industry, as well as the volatility of the securities market, made Kidder an unwise acquisition for GE. According to plaintiffs' expert, these analysts' fears were realized when Kidder reported at least intermittent losses from 1986 to 1991, despite substantial cash infusions from GE. In this context, Kidder's reported profits in 1992 and 1993, which included the false profits, took on special significance to investors and analysts who viewed Kidder as a turnaround success story.

Defendants contest both plaintiffs' portrayal of investors' perceptions during the relevant time period and plaintiffs' contention that Kidder's false profits created the illusion of a turnaround. In fact, defendants contend, Kidder would have been profitable in 1992 and 1993 even without the false profits. Nevertheless, despite these protestations,

plaintiffs have put forth sufficient evidence from which a reasonable trier of fact could find that Kidder's financial reports were important to GE investors. In addition, even if Kidder would have been profitable without the false profits, it is uncontested that the false profits significantly exaggerated that profitability. A reasonable trier of fact could conclude that defendants' alleged misstatements were material in this context.

In addition to these theories, the Court notes that the materiality of the misstatements must be considered in light of their impact on GE's reputation, wholly apart from their statistical impact on GE's reported earnings. Under plaintiffs' theory, the false profits enabled GE to tout Kidder's success, thereby allaying analysts' fears. That this success, at a minimum, was inflated likely would have been significant to a reasonable investor. Moreover, that a prominent subsidiary of GE was able to generate false profits, apparently without GE's knowledge, arguably raised concerns about GE's internal controls, efficiency, and integrity, all of which would have been relevant to a reasonable investor. *See Ross v. Warner*, 1980 WL 1474, at *8 (discussing materiality of failure to disclose questionable payments in terms of effect on public perception of management's integrity).

In rejecting defendants' statistical approach to materiality in this case, the Court is mindful of the rationale underlying the materiality standard. Section 10(b) and Rule 10b–5 are meant to encourage accurate disclosure of relevant information to the market. The requirement of materiality recognizes that this purpose ultimately is thwarted where the threat of liability leads corporate managers to bury shareholders "in an avalanche of trivial information." *TSC Indus.*, 426 U.S. at 448, 96 S.Ct. 2126. In this case, there is no such threat: no reasonable corporate manager could believe that the market is better served by the dissemination of false financial information and no reasonable investor would consider such financial information trivial.[13]

13. None of the cases cited by defendants persuade the Court to reach a different conclusion. Both *In re Burlington Coat Factory Sec. Litig.*,

114 F.3d 1410, 1427 (3d Cir.1997), and *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir.1996), involved allegations that the de-

Accordingly, the Court rejects defendants' argument that the alleged misstatements are immaterial as a matter of law due to their comparatively minor relation to GE's earnings. Plaintiffs have put forth sufficient evidence from which a reasonable trier of fact could conclude that defendants' alleged misstatements were material in the context of this case. Thus, the Court denies defendants summary judgment on this basis.

### 3. *Timing of the Alleged Misstatements*

Defendants also argue that any alleged misstatements made outside the class period are immaterial as a matter of law. Here, the class period, as alleged by plaintiffs, is February 16, 1993, through April 15, 1994. The relevant statements to this argument include four press releases by GE (Compl.¶¶ 36–38, 40), two SEC filings by GE (Compl.¶¶ 39, 41), and a December 9, 1992 *Wall Street Journal* article that quoted Carpenter (Compl.¶ 42), all of which occurred before the start of the class period. In addition, defendants claim that an April 1994 *Institutional Investor* article that quoted Kidder officials (Compl.¶ 59) is immaterial as a matter of law because it

could not have reached investors until after the class period closed.

■ Beginning with the *Institutional Investor* article, plaintiffs do not contest that copies of that magazine first were delivered to the United States Post Offices for mailing on April 14, 1994. Nor do they contest that investors would not have received the magazine until after the close of the class period. Based on these concessions, there is no dispute as to whether information contained in the magazine would have affected investors. Accordingly, defendants cannot be held liable for such information.

■ As for the statements made prior to the start of the class period, defendants are correct in noting that stale information is immaterial as a matter of law. *See In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239, 1270 (S.D.N.Y.1996); *Kidder I*, 1995 WL 590624, at *5; *Rand v. Cullinet Software, Inc.*, 847 F.Supp. 200, 210 (D.Mass.1994). Nevertheless, where the information in the press releases and public filings remains current and defendants fail to correct its falsity, a reasonable trier of fact could conclude that the

fendants failed to disclose information where that information would have had no discernible impact on the truth of the defendants' prior statements. Similarly, *Ferber v. Travelers Corp.*, 802 F.Supp. 698, 708 (D.Conn.1992), involved allegations of a failure to disclose where the alleged omission was immaterial "[i]n view of the entirety of information disclosed." None of these cases involved situations where a defendant affirmatively misrepresented actual financial data. Notably, the court in *Burlington Coat Factory* recognized this distinction, indicating that its analysis of materiality would have been different in the context of earnings overstatements. *See Burlington Coat Factory*, 114 F.3d at 1421 n. 9.

*SEC v. Hoover* involved allegations that an insider had failed to disclose a slight adjustment to the company's *projected* earnings. *See SEC v. Hoover*, 903 F.Supp. 1135, 1136–37 (S.D.Tex. 1995). In the context of that case, the alleged failure to disclose could not have affected the total mix of information available, where the company in question had made numerous public disclosures to give notice that an adjustment to earnings was likely. *Id.* In contrast, here the alleged misstatements concerned actual, as opposed to projected, earnings and investors had no reason to expect anything other than accurate information.

Both *Parnes v. Gateway 2000, Inc.* and *In re Westinghouse Sec. Litig.* are easily distinguishable

on their facts. In *Parnes,* the defendant's slight overstatement of assets, which was caused by a failure to discount for "doubtful accounts receivable," was immaterial in the context of an initial public offering where investors were faced with a high-risk/high-yield investment opportunity. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir.1997). Similarly, in *Westinghouse,* the court found that the defendants' failure to disclose *de minimis* impairments to a loan portfolio and improper classifications of certain nonearning loans could not have significantly influenced a reasonable investor considering an initial public offering. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714–15 (3d Cir.1996). Neither of these cases purported to hold, as defendants suggest, that affirmative misstatements of financial data could be found immaterial as a matter of law whenever they fell below a statistical cut-off. On the contrary, both cases recognized that the materiality of such misstatements must be viewed in the context of when they were made. *See Parnes,* 122 F.3d at 547; *Westinghouse,* 90 F.3d at 714 n. 14.

Finally, *Leasco Corp. v. Taussig,* 473 F.2d 777 (2d Cir.1972), is completely inapposite. *Leasco* involved a claim for negligent misrepresentation—not securities fraud—where the alleged misrepresentation had been caused by subsequent unforeseeable circumstances. *See Leasco,* 473 F.2d at 782–83.

information was material. *See JWP Inc.*, 928 F.Supp. at 1270 (whether information is stale is question of fact for jury to decide); *In re ZZZZ Best Sec. Litig.*, 864 F.Supp. 960, 975 (C.D.Cal.1994) (failure to correct prior materially misleading statement raises genuine issue of fact as to whether statement "continued to artificially inflate the market value of [the] security").

Whether or not the statements at issue were made during the class period is not dispositive of this issue. Plaintiffs have properly pled the statements in their complaint and have put forth sufficient evidence from which a reasonable trier of fact could conclude that the information caused injury during the class period.[14] *Cf. Goldstein v. Quantum Health Resources, Inc.*, 1996 WL 813245, at *2 (C.D.Cal.1996) (dismissing statements made outside the class period where plaintiff had failed to properly plead such statements in the complaint). Accordingly, defendants' motion for summary judgment on the statements made prior to the class period is denied.

*4. The Statements in the FOCUS Reports*

■ Next, defendants argue that statements allegedly made by Kidder in two SEC filings are immaterial as a matter of law because these filings were not targeted at the investment public. According to defendants, "an investor seeking information concerning GE would not search out and review" these reports.

The relevant statements were made on February 26, 1993, and February 25, 1994, in Form X–17A–5 filings with the SEC (Compl.¶¶ 43, 54). These filings, also knows as "FOCUS Reports," purported to state Kidder's year-end financial condition for the previous year. According to plaintiffs, these reports were materially false because they included Kidder's false profits.

Defendants concede that the Focus Reports were available to the public. They also acknowledge that financial statements filed with the SEC pursuant to reporting requirements generally are presumed to have affected the market. *See SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 862–63 (S.D.N.Y.1997). Nevertheless, defendants argue that the FOCUS Reports should be found immaterial as a matter of law because, unlike other public filings, FOCUS Reports are not intended to provide information to investors. In support of this argument, defendants note that none of the four analysts deposed in this action had heard of FOCUS Reports or used such reports in making recommendations about GE's stock.

The Court disagrees. A reasonable trier of fact could conclude that the FOCUS Reports, which were undeniably in the public domain, had a material impact on the total mix of information available to investors. The Court cannot say as a matter of law that a reasonable investor would not have considered these reports or that correction of the false information contained in the reports would not have assumed actual significance in the deliberations of a reasonable investor.

Accordingly, defendants' motion with respect to the materiality of the FOCUS Reports is denied.

*5. Truthful Statements*

Finally, defendants argue that they cannot be held liable for certain statements alleged in the complaint because these statements were true.[15]

■ The Court agrees with defendants as to a May 21, 1992 press release by GE (Compl.¶ 37), a July 15, 1992 press release by

---

**14.** At the same time, plaintiffs' eleventh hour attempt to add allegations related to Kidder's 1992 Annual Report is rejected. This Report was never alleged in the Complaint and cannot be added by plaintiffs now through mere allegations in plaintiffs' Memorandum of Law.

**15.** Defendants also argue that they cannot be held liable for those statements in the April 1994 *Institutional Investor* article that were mere "puffery." These included statements about Kidder's "culture," "cost controls," "integrity," "strategic

planning," and "personal accountability." (Compl.¶ 59) The Court agrees with defendants that they cannot be liable for these statements insofar as these statements amount to mere puffery. *See Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996); *San Leandro*, 75 F.3d at 811. Nevertheless, because the Court already has found that the *Institutional Investor* article is immaterial as a matter of law because it was distributed after the class period, the Court need not reach this issue.

GE (Compl.¶ 38), and a July 13, 1993 press release by GE (Compl.¶ 46). The Court disagrees with defendants, however, as to an April 6, 1994 press release by GE (Compl.¶ 56).

In the May 21, 1992 press release, GE stated that Kidder had grown more rapidly than most of its competitors and that Kidder's net income for the first quarter of 1992 exceeded its income for the entire previous year. Plaintiffs have not put forth any evidence that either of these statements was false. In fact, even excluding Kidder's false profits, both of these statements may have been true, with Kidder earning $259 million in 1992 compared to $119 million in 1991. Without evidence to the contrary from plaintiffs, defendants are entitled to summary judgment on this statement.

The same is true for the July 15, 1992 press release, which reported "continued double-digit increases" at Kidder for the second quarter of · 1992. Plaintiffs have not submitted any evidence to refute defendants' contention that Kidder did, in fact, report "double-digit increases" even without the false profits.

Summary judgment is warranted on the July 13, 1993 press release as well. In that press release, GE stated that its net earnings and Kidder's net earnings for the second quarter of 1993 reached record levels. Defendants have submitted evidence that these statements were true and plaintiffs have failed to refute this evidence. Accordingly, defendants cannot be liable for the July 13, 1993 press release.

▮▮▮ The Court disagrees, however, with defendants as to the April 6, 1994 press release. In that press release, GE, "in response to media inquiries regarding GE's stock price and Kidder['s] performance," stated that Kidder's first quarter earnings for 1994 would "be excellent." Defendants maintain that this statement would have been true had GE not taken the subsequent $350 million pre-tax charge to its earnings. Be that as it may, there is no dispute that GE, in fact, did take the pre-tax charge. Moreover,

plaintiffs have submitted sufficient evidence to suggest that defendants either knew or recklessly ignored the fact that imminent disclosure of the false profits would affect Kidder's and GE's first quarter earnings. Based on this evidence, a reasonable trier of fact could conclude that the April 6, 1994 statement was both false and material.

\* \* \* \* \* \*

In sum, the Court rejects defendants' arguments that (1) all of the alleged misstatements were immaterial as a matter of law due to their relation to GE's earnings; (2) defendants cannot be liable as a matter of law for statements made prior to the class period; and (3) defendants cannot be liable for statements made in the FOCUS reports. The Court, however, agrees with defendants that they cannot be liable for (1) statements distributed after the class period in the *Institutional Investor* article; or (2) truthful statements made in the three GE press releases. Accordingly, defendants' motions for summary judgment based on materiality are denied except insofar as plaintiffs seek to recover for statements made in the *Institutional Investor* article and the three truthful GE press releases.

### C. *Scienter*

Having decided the issue of materiality, the Court now turns to defendants' arguments on scienter. All of the defendants, except Jett,[16] claim that they are entitled to summary judgment on this basis.

#### 1. *Scienter Under § 10(b) & Rule 10b–5*

▮▮▮ To prove scienter under § 10(b) and Rule 10b–5, plaintiffs must demonstrate that defendants acted with knowledge of the falsity of their statements and with an intent to deceive investors, *see Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or with such recklessness that an intent to deceive may be inferred. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120–21 (2d Cir.1982); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 46 (2d Cir.), *cert. denied,*

---

**16.** While not admitting scienter, Jett apparently concedes that there is at least a genuine issue of material fact as to his knowledge and intent. The Court agrees.

439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *In re Leslie Fay Cos. Sec. Litig.*, 871 F.Supp. 686, 692 (S.D.N.Y.1995).

■ "Recklessness" under the securities laws includes "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *SEC v. McNulty*, 137 F.3d 732, 740 (2d Cir.1998) (quoting *Rolf*, 570 F.2d at 47). Such conduct, at a minimum, encompasses willful blindness. *See In re Fischbach Corp. Sec. Litig.*, 1992 WL 8715, at *6 (S.D.N.Y.1992) ("reckless disregard of the truth satisfies the scienter requirements of § 10(b) when the defendant deliberately failed to acquire the information that would have indicated to her that her statements were false or misleading"); *see also Leslie Fay*, 871 F.Supp. at 690–92 (discussing standard for actionable recklessness in Second Circuit).

■ "Proof of scienter need not be direct, but may be 'a matter of inference from circumstantial evidence.'" *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir.1984); *see also AUSA Life Ins. Co. v. Ernst & Young*, 991 F.Supp. 234, 247 (S.D.N.Y.1997). Plaintiffs may satisfy the scienter requirement by proving facts establishing a motive to commit fraud and an opportunity to do so, or by facts constituting circumstantial evidence of either reckless or conscious misbehavior. *See San Leandro*, 75 F.3d at 813; *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir.1993).

■ Whether a plaintiff can establish scienter usually cannot be decided on summary judgment. *See Wechsler*, 733 F.2d at 1058–59. As a result, defendants are entitled to summary judgment on this basis only if plaintiffs have failed to present facts from which a reasonable trier of fact could find that defendants acted knowingly and intentionally, or with the requisite form of recklessness. *See id.*

### 2. *Kidder & Kidder Group*

■ Kidder and Kidder Group argue that they are entitled to summary judgment because plaintiffs have failed to present facts to support an inference of scienter. In particular, Kidder and Kidder Group contend that plaintiffs have failed to submit any direct or circumstantial evidence that officials at Kidder or Kidder Group knew of the false profits or acted with willful blindness to them, or that they had a motive to disseminate false financial information. The Court disagrees.

First, plaintiffs have put forth evidence that Jett did nothing to hide the nature of his trades. All of the forward recons were entered openly in Kidder's computers and in Kidder's internal books and records. Such trades were recorded in Kidder's "Red Book," a calendar maintained on the trading floor of the Fixed Income Division, and also in trade tickets and confirmation slips processed by Kidder's back office. Jett has stated that his supervisors were fully aware of his trading activities.

According to plaintiffs' evidence, forward recons with customers ordinarily would have been rare. Mullin described such trades as "very occasional," with only "a handful of trades a year." Yet, during the class period, Jett generated thousands of forward recons. The sheer volume of these trades arguably should have raised a red flag to Jett's superiors. Another red flag may have been raised due to Jett's lack of experience in government bond trading and his apparent overnight record success.

Plaintiffs also have submitted evidence that officials at Kidder and Kidder Group either knew or should have known that Jett's forward recons had no economic value. As explained above, such exchanges merely entail a promise to trade economically equivalent securities in the future. That thousands of these trades were being entered arguably should have raised a red flag to Kidder officials who were experienced in government bond trading. This included Mullin and Cerullo, as well as David Bernstein, the Fixed Income Division Controller and Cerullo's "right-hand man."

Moreover, a reasonable trier of fact could find that officials at Kidder and Kidder Group knew that forward recons would cause profit distortions on Kidder's computers. Notably, Jett did nothing to alter Kidder's computer system or to manipulate how

the false profits were calculated. In fact, it was Kidder that modified the computer system in November 1992 to allow traders such as Jett to enter future settlement dates greater than five days. This enabled Jett to generate the vast majority of Kidder's false profits. Notably as well, other traders at Kidder, including those in the Fixed Income Division, manually adjusted their entries on forward settling trades to avoid the type of profit distortions that Jett's trades generated. Such adjustments were standard policy in the mortgage ledger area, but not required for government bonds.

Furthermore, plaintiffs have submitted evidence that officials at Kidder, including Cerullo and Bernstein, directed Jett to use forward recons and forward strips to manipulate Kidder's balance sheet. Such evidence indicates that the Kidder officials understood the potential for false profits and the opportunity to use forward settling trades to manipulate financial information.

This inference is strengthened by Jett's claim that Bernstein told him in May 1993 to limit the settlement dates on his forward recons to no more than 90 days. From this evidence, a reasonable trier of fact could conclude that Bernstein—and hence Kidder and Kidder Group—knew of and endorsed the profit distortions, but hoped to contain them to avoid detection.

Plaintiffs also have submitted evidence that officials at Kidder and Kidder Group received notice of the false profits. Plaintiffs have submitted evidence that at least four Kidder employees—Charles Fiumefreddo, James Rizzi, Brian Finkelstein, and Hugh Bush—raised concerns about Jett's reported profits and the potential for profit distortions. Bush claims that he raised concerns about Jett's trading with Mullin as early as the fourth quarter of 1991, when Jett first started using forward recons. Shortly thereafter, Bush was fired by Cerullo. Rizzi claims that he raised concerns in meetings with Bernstein and Finkelstein, suggesting that Jett's profits resulted from "paper trades" that made no economic sense. Rizzi has stated that he tried to explain to Bernstein that "if we [Kidder's traders] did forward trades and were stripping and recon-

ning, there should never be a profit in there, there couldn't possibly be a profit, because everything should equal out." According to Rizzi, Bernstein responded by telling Rizzi that he had examined Jett's trading and that "everything was ok." Based on this evidence, a reasonable trier of fact could conclude that if officials at Kidder and Kidder Group remained ignorant of Jett's false profits it was because they deliberately chose to look the other way.

Plaintiffs also point to evidence of a conversation between Bernstein and Mullin in September 1993. At that time, according to Mullin, Bernstein asked Mullin if he knew of any reason why a trader would engage in forward strips or recons. When Mullin said he did not know of any reason and then asked Bernstein why he had asked, Bernstein allegedly told him "don't worry about it." A reasonable trier of fact could view this evidence as indicative of a pattern of willful blindness.

Plaintiffs further note that the Federal Reserve raised concerns with officials at Kidder and Kidder Group about Jett's trades during the class period. These concerns began in May 1993, when Kidder's trading grew to between 40% to 50% of all strip and recon activity in the country. The Federal Reserve made another inquiry in September 1993. Finally, according to an internal memorandum from Kidder, in February 1994, the Federal Reserve instructed Kidder to "remove all unsettled transactions . . . from the calculation of [Kidder's] Trade Date Inventory Position." A reasonable trier of fact could infer that these concerns put Kidder and Kidder Group on notice of the problems with Jett's trades, or that Kidder and Kidder Group already knew of the false profits, but chose to ignore the Federal Reserves' warnings. A reasonable trier of fact also could find that the Federal Reserves' instruction to remove all unsettled transactions finally forced officials at Kidder and Kidder Group to disclose Kidder's false profits. This supports plaintiffs' theory that officials at Kidder and Kidder Group eventually realized that the false profits scheme had to end.

Finally, plaintiffs have submitted evidence of motive and opportunity. In denying de-

fendants' motions to dismiss the complaint, the Court found two viable motives: first, that Kidder felt pressure from GE to produce profits and to reduce its balance sheet; and second, that Kidder needed to appear profitable to acquire badly needed bank financing from Union Bank of Switzerland ("UBS"). With the completion of discovery, plaintiffs have now submitted evidence to support both motives.

With regard to the pressure from GE, plaintiffs have submitted evidence that officials at Kidder and Kidder Group felt pressure from GE to show profitability and to reduce Kidder's balance sheet. Plaintiffs also have submitted evidence that Kidder took steps to address GE's concerns, including evidence that Kidder directed Jett to use strips and recons to manipulate Kidder's balance sheet. These facts constitute circumstantial evidence from which a reasonable trier of fact could infer reckless or conscious misbehavior.

With regard to the loan from UBS, the Court notes that Kidder and Kidder Group not only had a motive to increase profits, but also to delay disclosure of their alleged scheme until after the loan closed on March 25, 1994. In other words, even assuming that Kidder could have secured the loan without the false profits, at some point Kidder officials may have believed that disclosure of the profits, and the resulting scandal, would have put the loan in jeopardy. Evidence that Kidder and Kidder Group ultimately disclosed the false profits almost immediately after the loan closed supports this theory.

Based on these facts, plaintiffs have submitted sufficient evidence from which a reasonable trier of fact could conclude that officials at Kidder and Kidder Group either knew of or consciously avoided knowledge of Jett's trading activities and the false profits. This evidence is sufficient to defeat Kidder's

and Kidder Group's motions for summary judgment.[17]

### 3. Cerullo

 Cerullo served as head of the Fixed Income Division during the class period. It was his duty to monitor the trading in the division, including Jett's trading of government bonds. Other than Jett, Cerullo is the defendant who was in closest proximity to the false profits.

A reasonable trier of fact could conclude from the evidence described above, including all the red flags, that Cerullo either knew of or consciously avoided knowledge of the false profits. Such evidence includes allegations that Cerullo reviewed Jett's daily profit and loss reports and at least twice examined the Red Book, which contained all the information Cerullo needed to understand the false profits scheme. Given Cerullo's admitted knowledge that Jett engaged in voluminous forward trades and that Jett engaged in strips and recons with the Federal Reserve, a reasonable trier of fact could infer that Cerullo either knew of the false profits or recklessly turned a blind eye to the obvious danger of such profits. As the Court found in denying Cerullo's motion to dismiss, Cerullo "was responsible for the accuracy and completeness of Kidder's representations to the investing public concerning the assets and income generated by those under his supervision." *Kidder I,* 1995 WL 590624, at *8. A reasonable trier of fact could conclude that if Cerullo remained ignorant of the false profits it was only because he willfully ignored red flags that "would have raised suspicions which should have resulted in inquiry which would have disclosed the fraud." *Id.*

Moreover, as a member of Kidder's Board of Directors and the Kidder Group Management Committee, Cerullo possessed the same motives as Kidder and Kidder Group to generate false profits and then delay disclosure.

---

17. In further opposition, plaintiffs argue that Jett's scienter can be imputed to Kidder and Kidder Group. The Court agrees with plaintiffs insofar as plaintiffs may be able to show at trial that Jett acted in furtherance of Kidder's interests and at the direction of his supervisors. Nevertheless, having found sufficient evidence to support a reasonable inference of scienter, the Court need not decide this issue now as matter of law, because there is a genuine dispute as to whether Jett in fact was acting adversely to Kidder's interests. *See Kidder I,* 1995 WL 590624, at *4; *Kaplan v. Utilicorp United, Inc.,* 9 F.3d 405, 407 (5th Cir.1993); *In re Investors Funding Corp. Sec. Litig.,* 523 F.Supp. 533, 541 (S.D.N.Y.1980).

A reasonable trier of fact could conclude that Cerullo had a motive to distort Kidder's profits to allay GE's concerns about Kidder's profitability and balance sheet and to ensure that Kidder received badly needed financing from UBS.

Also, plaintiffs have submitted evidence, including deposition testimony from Cerullo, that Cerullo received annual bonuses based, in part, on the reported profits of the Fixed Income Division. These profits obviously included profits generated by Jett's forward recons. And these bonuses were substantial. On top of a base salary of $600,000 per year, Cerullo received bonuses of $11.4 million in 1992 and $15.4 million in 1993. These were significant increases over the $6.4 million bonus Cerullo received in 1991, the year before Jett's forward recons started to generate substantial false profits. Notably, Cerullo normally received his bonuses in February of the following year. A reasonable trier of fact could infer from the timing of the ultimate disclosure of the false profits that Cerullo had a motive to delay disclosure until after he received his bonus.

Based on all this evidence, there clearly are triable issues of fact as to Cerullo's scienter. Accordingly, Cerullo's motion for summary judgment on this basis is denied.

### 4. O'Donnell

O'Donnell served as Kidder's Chief Financial and Administrative Officer during the class period. In that capacity, he was responsible for overseeing Kidder's operations and audit and credit functions. A reasonable trier of fact could conclude that O'Donnell willfully chose to ignore the red flags described above. Indeed, O'Donnell's position, by its very nature, would have required O'Donnell to scrutinize Kidder's financial information before he authorized its public dissemination.

In particular, plaintiffs have put forth evidence that O'Donnell reviewed reports that would have or should have alerted him to the false profits. These included Government Credit Exception Reports, which, according to plaintiffs, consistently showed that Kidder owed itself an amount roughly equal to Kidder's false profits. As Chief Financial and Administrative Officer, O'Donnell arguably should have noticed that the false profits resulted in the receipt of no actual income.

Notably, O'Donnell had access to at least one internal audit report that revealed that Jett was engaging in substantial forward recons, as well as access to auditor's work papers that showed that Jett's trades were with the Federal Reserve. A reasonable trier of fact could conclude that O'Donnell either knew or consciously avoided knowledge that numerous trades that appeared to generate massive profits were in fact economic nullities.

Further, plaintiffs have submitted evidence that O'Donnell questioned the risk management practices within the Fixed Income Division. On at least one occasion, O'Donnell expressed concern that Cerullo was "above the law." On another, O'Donnell told Carpenter that his "eight years of experience with Cerullo had taught [him] that [Cerullo] acts as a greedy trader, with controls and peer relations of secondary importance." A reasonable trier of fact could conclude that if O'Donnell remained ignorant of the false profits it was only because he willfully ignored his legitimate concerns and turned a blind eye to the many red flags described above.

Finally, as with the other defendants, plaintiffs have submitted sufficient evidence to support a finding that O'Donnell had a motive to either hide the false profits or recklessly disregard the many warning signs of their existence. As part of Kidder's management, O'Donnell arguably had a motive to show GE that Kidder could be profitable and to suppress disclosure of the profits until after the UBS loan closed.

Based on this evidence, a reasonable trier of fact could conclude that O'Donnell possessed the requisite scienter. Accordingly, O'Donnell's motion for summary judgment on this ground is denied.

### 5. Carpenter

During the class period, Carpenter served as Kidder's Chairman of the Board of Directors and Chief Executive Officer. He also chaired Kidder's Group Management Committee. From his position at Kidder, Car-

penter had access to all the red flags described above. At a minimum, the volume of Jett's trades and the importance of Jett's profits to Kidder's overall financial position should have warranted much closer scrutiny by Carpenter. These facts, as alleged, raise an inference of more than mere mismanagement. Indeed, a reasonable trier of fact could conclude that if Carpenter did not know of the false profits, it was only because he willfully ignored all of the obvious warning signs.

In particular, plaintiffs have put forth evidence that Carpenter spoke to O'Donnell as to O'Donnell's concerns about mismanagement in the Fixed Income Division and Cerullo's management style. According to plaintiffs' evidence, on at least two occasions, Carpenter expressed concern about Jett's level of profits. Yet, Carpenter claims to have remained ignorant as to whether Jett's profits were legitimate or in fact illusionary. While a reasonable trier of fact might conclude that these facts demonstrate no more than negligence, a reasonable trier of fact might also infer that Carpenter either knew of or intentionally avoided knowledge of the false profits.

Moreover, plaintiffs' theories as to motive and opportunity are particularly compelling with regard to Carpenter since he was the person most accountable for Kidder's performance. Based on plaintiffs' evidence, a reasonable trier of fact could conclude that Carpenter wanted to show GE that Kidder could generate substantial profits. A reasonable trier of fact further could conclude that Carpenter needed to generate the false profits and then delay disclosure of the scheme until Kidder could acquire the UBS loan.

In short, plaintiffs have submitted sufficient evidence from which a reasonable trier of fact could infer that Carpenter either knew of or consciously ignored Kidder's false profits. Accordingly, Carpenter's motion for summary judgment on this basis is denied.

\* \* \* \* \* \*

In sum, plaintiffs have submitted sufficient evidence from which a reasonable trier of fact could find that each of the defendants possessed the requisite scienter during the class period. The parties' submissions con-

vince the Court that this is an issue particularly well suited for resolution at trial. Accordingly, defendants' motions for summary judgment based on scienter are denied.

### D. Cerullo's Additional Arguments

Finally, Cerullo argues that he is entitled to summary judgment because plaintiffs cannot establish that he is responsible for any of the alleged misstatements and because he owed no duty to GE's shareholders. The Court rejects these arguments.

As to the first argument, plaintiffs have submitted ample evidence of Cerullo's involvement in conveying the false profits that led to the alleged misstatements. That Cerullo was not the actual speaker for any of the alleged misstatements does not mean that he cannot be found primarily liable. *See Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir.1997); *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir.1996); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1120 (W.D.Mich.1996); *see also Kidder I*, 1995 WL 590624, at \*9. Plaintiffs have put forth sufficient evidence from which a reasonable trier of fact could conclude that Cerullo was knowingly and inextricably involved in generating the false profits that led to the misstatements. As head of the Fixed Income Division, Cerullo would have known that any reported profits would reach the public, including GE investors.

As for the second argument, it is irrelevant whether Cerullo owed a fiduciary duty to GE shareholders. Fiduciary duty is relevant only in § 10(b) cases where the plaintiff is alleging a failure to disclose. *See Chiarella v. United States*, 445 U.S. 222, 234–35, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *In re Canandaigua Sec. Litig.*, 944 F.Supp. 1202, 1208 (S.D.N.Y.1996). Here, in contrast, plaintiffs allege affirmative misrepresentations. Under the securities laws, Cerullo owed an inherent duty not to participate in the making of material misrepresentations to the marketplace. The mere fact that Cerullo might not have been in a fiduciary relationship with GE shareholders did not

give him carte blanche to disseminate false information.

Accordingly, Cerullo's motion for summary judgment on these bases is denied.

## CONCLUSION

Based on the evidence submitted by the parties, the Court concludes that there are several genuine issues of material fact that preclude granting defendants' motions for summary judgment. Despite the appeal of many of defendants' arguments, the Court remains convinced that ultimate resolution of this action remains particularly well-suited for jury determination. Accordingly, defendants' motions for summary judgment are denied, except insofar as there is no genuine dispute as to the materiality of the statements contained in the *Institutional Investor* Article and the three press releases by GE dated May 21, 1992, July 15, 1992, and July 13, 1993.

In addition, with the benefit of additional judicial analyses since the Supreme Court decided *Central Bank*, the Court agrees with plaintiffs that defendants may be liable for statements attributed to GE if the requirements for primary liability are met. Accordingly, plaintiffs' application to reinstate those statements is granted.

Plaintiffs' counsel is directed to initiate a telephone conference between the parties and the Court at 5:30 p.m. on July 9, 1998. At that time, the Court will set a trial date for this matter and address any remaining outstanding issues.

**SO ORDERED.**