**RMED INTERNATIONAL, INC., et al., Plaintiffs,**

v.

**SLOAN'S SUPERMARKETS, INC., and John Catsimatidis, Defendants.**

**No. 94 CIV 5587 PKL RLE.**

United States District Court, S.D. New York.

Feb. 21, 2002.

---

21. 17 C.F.R. § 240.14e–1(b) (2001).

22. *See* 15 U.S.C. § 78n(d)(5); 17 C.F.R. § 240.14d–7(a)(1) (2001).

Lehman & Gikow, P.C., David H. Gikow, Arthur R. Lehman, New York City, for Plaintiffs.

Jaffe & Asher, Gregory E. Galterio, Joan M. Perryman, Mark P. Hannafey, New York City, for Defendant John Catsimatidis.

Wolf Block Schorr & Solis–Cohen, Jonathan Honig, New York City, for Defendant Sloan's Supermarkets, Inc.

## OPINION AND ORDER

LEISURE, District Judge.

This class action under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, arises out of the purchase of common stock of defendant Sloan's Supermarkets, Inc. ("Sloan's") by a class of investors who bought the stock at allegedly artificially inflated prices during the period of January 7, 1993 through June 2, 1994.[1] Plaintiffs rely on a "fraud

---

1. RMED International, Inc., a corporation organized under the laws of Colorado, brings the instant action on behalf of all persons who purchased the common stock of defendant

on the market" theory, alleging that the company's chief executive officer, defendant John A. Catsimatidis, made materially false and misleading representations and failed to disclose certain material facts regarding a Federal Trade Commission ("FTC") antitrust investigation of Sloan's. Plaintiffs also allege that defendants' conduct violates Article 23–A of the General Business Law of New York, and constitutes both fraud and a breach of fiduciary duties owed to the plaintiffs under state common law.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants now move for summary judgment as to each of the causes of action. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

### A. *Factual Background*

RMED International, Inc. ("RMED"), is a publicly traded corporation engaged in the business of marketing and selling diapers. *See* Defendant's Rule 56.1 Statement ("Def. 56.1 S.") at ¶ 1; Plaintiff's Rule 56.1 Statement ("Pl. 56.1 S.") at ¶ 1. For investment purposes, RMED has used corporate funds to purchase various securities, including shares of Sloan's stock. Defendant Sloan's is a publicly traded corporation which operates supermarkets in the New York metropolitan area. Until late March 1993, Sloan's was known as Designcraft Industries, Inc. *See* Def. 56.1 S. at ¶ 2; Pl. 56.1 S. at ¶ 2. Defendant Catsimatidis is and has been the chairman of the board, chief executive officer, treasurer

and 37% shareholder of Designcraft, and later Sloan's, since July 28, 1988. *See* Def. 56.1 S. at ¶ 3; Pl. 56.1 S. at ¶ 3; Complaint at ¶ 3. In addition, at all times relevant to this action, Catsimatidis is and has been the sole shareholder, president, and chief executive officer of Red Apple Companies, Inc. ("Red Apple"). *See* Def. 56.1 S. at ¶ 4; Pl. 56.1 S. at ¶ 4.

Red Apple operates twenty-one supermarkets in the New York City area under the names "Red Apple," "Sloan's," and "Gristede's." Prior to April 1991, all supermarkets in the New York City metropolitan area that operated under the name Sloan's were owned by a corporation then known as Sloan's Supermarkets ("Old Sloan's"), a company that is unrelated to the defendant Sloan's in this action. In April 1991, Red Apple, through an affiliate wholly-owned by Catsimatidis called Supermarket Acquisition Corp. ("SAC"), agreed to buy twenty-one of Old Sloan's supermarkets.[2] *See* Def. 56.1 S. at ¶ 5; Complaint at ¶ 3; Sloan's Supermarkets, Inc. Proxy Statement, October 1, 1997, at 1, 4, attached as Ex. C to the Affidavit of Jonathan Honig, Esq., June 16, 2000 ("Honig Aff."); Affidavit of Arthur R. Lehman, Esq., July 27, 2000 ("Lehman Aff."), at ¶ 5. Although the agreement was consummated in April of 1991, the closing agreement called for Red Apple to purchase the stores on a staggered basis over an extended time period. *See* Lehman Aff. at ¶ 5. Also in April of 1991, Old Sloan's changed its name to CKMR Corporation ("CKMR"). On December 24, 1992, defendant Sloan's, under its prior name Designcraft, entered into an agreement with CKMR to acquire eleven Sloan's su-

---

Sloan's between January 7, 1993 and June 2, 1994.

**2.** There is some discrepancy whether Red Apple, through its affiliate SAC, acquired 20 or 21 supermarkets. The plaintiffs' 56.1 Statement states that in April 1991, SAC acquired

20 supermarkets. *See* Pl. 56.1 S at ¶ 5. The complaint filed by the plaintiffs, however, as well as the defendants' 56.1 Statement, state that in April of 1991, Red Apple acquired 21 supermarkets. *See* Complaint at ¶ 3; Def. 56.1 S. at ¶ 5.

permarkets in New York City. Shortly after the transaction became effective on January 7, 1993, Designcraft changed its name to Sloan's. *See* Def. 56.1 S. at ¶ 6; Pl. 56.1 S. at ¶ 6. Thus, from April 1991 to the present, Red Apple, a company wholly-owned by Catsimatidis, has operated twenty-one Sloan's supermarkets, and from March 1993 to the present, defendant Sloan's, a company for which Catsimatidis is the CEO and the largest shareholder, has operated eleven Sloan's supermarkets in New York City.

On August 6, 1991, after Red Apple had begun to acquire three of the twenty-one supermarkets from Old Sloan's, the FTC sent a private letter to Red Apple's general counsel informing Red Apple of the FTC's concern that the acquisitions by Red Apple violated federal antitrust laws. Specifically, the letter informed Red Apple that the FTC was concerned that the acquisitions did not comply with the Hart–Scott–Rodino Act,[3] and might violate Section 1 of the Clayton Act[4] and Section 5 of the Federal Trade Commission Act.[5] *See* Lehman Aff. at ¶ 6; FTC Letter to Red Apple, August 6, 1991 ("FTC Letter"), attached as Exhibit B to Lehman Aff.[6] Further, the letter requested that Red Apple

---

3. The Hart–Scott–Rodino Act Antitrust Improvements Act of 1976 requires parties to acquisitions over a certain size of assets or voting securities to give advance notice to the Federal Trade Commission. The parties must then wait certain designated periods before the consummation of such acquisitions. *See* 15 U.S.C. § 18a.

4. Section 1 of the Clayton Act provides in relevant part:

 No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
 No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.
 15 U.S.C. § 18.

5. Section 5 of the of the Federal Trade Commission Act states in relevant part:

 (a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade
 (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
 (2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations ... from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.
 15 U.S.C. § 45.

6. The letter states in pertinent part:

 We have received information that Red Apple has already acquired three Sloan's supermarkets and may be in the process of acquiring additional Sloan's supermarkets. Apart from the question whether this transaction or any further proposed transaction(s) may be reportable under the Hart–Scott–Rodino Act ... this letter is to advise you that the Commission's staff has concerns that these acquisitions, if consummated, may substantially lessen competition in violation of Section 1 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. . . .

"delay consummation of these transactions pending completion of any investigation we may initiate into the potential anticompetitive [sic] effects of the acquisitions." FTC Letter. Finally, the FTC requested that Red Apple cease all document destruction and preserve all documents pending the completion of any investigation. *See id.*

In September of 1991, the FTC commenced an investigation of the Red Apple acquisition, considering whether Red Apple's acquisitions violated antitrust laws, and whether Red Apple and Catsimatidis should be required to divest themselves of certain Sloan's supermarkets. *See* Def. 56.1 S at ¶ 7. On September 12, 1991, the FTC served a subpoena duces tecum on Red Apple. *See* Subpoena from the FTC, September 12, 1991, attached as Ex. I to Lehman Aff. Around this same time period, the Attorney General's Office of the State of New York also began to investigate the Red Apple acquisition, serving

Red Apple with a subpoena duces tecum on September 6, 1991. *See* Subpoena from the State of New York Department of Law, September 6, 1991, attached as Ex. H to Lehman Aff. This investigation continued through the January 1993 acquisition by defendant Sloan's of eleven supermarkets from Old Sloan's,[7] and culminated in a complaint filed by the FTC on May 27, 1994 against defendant Sloan's, Red Apple, SAC and defendant Catsimatidis alleging antitrust violations and seeking divestiture of ten supermarkets in New York City.[8] *See* FTC Complaint against Red Apple Sloans Supermarkets et. al. ("FTC Complaint"), attached as Ex. J to Honing Aff., at 7; Pl. 56.1 S. at ¶ 12. Catstimatidis, defendant Sloan's, SAC, Red Apple and the FTC ultimately entered into a consent decree. The decree required divestment of six supermarkets, and prohibited Catsimatidis, defendant Sloan's, SAC, and Red Apple from acquiring any interest in supermarkets south of 116th Street in Man-

Although federal district courts have the ability to order recission of consummated acquisitions that are likely to violate antitrust laws ... or to enjoin potential violations of the Hart–Scott–Rodino Act, we would prefer to avoid the necessity of seeking such relief. Accordingly, this is to request that you delay consummation of these transactions pending completion of any investigation we may initiate into the potential anticompetitive [sic] effects of the acquisition.

FTC Letter.

7. The FTC became aware of the deal by the defendants' SEC filings after the fact, and did not make any move to block the acquisition until late 1993. *See* Pl. 56.1 S. at ¶ 9; Deposition of Martin R. Bring, Esq., October 15, 1997 ("Bring Dep."), attached as Ex. C to Lehman Aff., at 73–74. The FTC contacted the defendants' attorney, Martin R. Bring, Esq., in September of 1993, and expressed concern over Sloan's acquisition from Old Sloan's. *See* Pl. 56.1 S. at ¶ 10; Bring Dep. at 72–74. However, defendant Sloan's was concerned about the antitrust implications of the deal prior to September, 1993. In September, 1992, while considering the eleven

supermarket acquisition by defendant Sloan's, the defendants had their attorneys research the antitrust implications of such an acquisition. *See* Plaintiff's 56.1 Counter Statement of Facts ("Pl. 56.1 Counter S."), at ¶ 19. The board of directors of defendant Sloan's, while considering the acquisition at a December 10, 1992 meeting, determined that it would be necessary to review legal counsel's research regarding the antitrust implications before approving the planned acquisition. *See* Pl 56.1 Counter S. at ¶ 20.

8. The FTC's formal complaint, in its notice of contemplated relief, stated that it would issue an order requiring the divestiture of ten specified Sloan's supermarkets, including four of the 11 supermarkets which had been acquired by the defendant Sloan's, or in the alternative, the divestiture of Red Apple or Gristede's supermarkets located nearest each of the specified Sloan's supermarkets and prohibiting defendant Sloan's, Red Apple, and Catsimatidis, for a period of ten years, from merging with or acquiring any stock or assets of, any supermarket in New York County without prior approval of the FTC. *See* FTC Complaint at 7; Pl. 56.1 S at ¶ 13.

hattan, except for acquisitions between or among themselves, for a period of ten years. *See* Pl. 56.1 S. at ¶ 14; FTC Consent Decree, February 28, 1995, attached as Ex. K to Honig Aff., at 1–10.

The FTC complaint was not publicly announced until June 2, 1994. *See* Pl. 56.1 S. at ¶ 12. However, several New York area newspapers, including the New York Post, the Daily News, and the New York Observer, reported in late August 1991 that Mark Green, City Consumer Affairs Commissioner, had written the FTC asking it to conduct an investigation of the proposed acquisition of Sloan's supermarkets by Red Apple. *See* Honig Aff., Ex. E–5, 6, 7, and 8. None of these articles indicate that the FTC was conducting an investigation of the defendant Sloan's. A publication called FTC:WATCH, a Washington Regulatory Reporting Associates publication, however, reported on October 21, 1991 that the FTC's Competition Bureau was investigating supermarket acquisitions by Red Apple.[9] *See* FTC:WATCH, October 21, 1991, attached as Ex. E–9 to Honig Aff. Articles published by FTC:WATCH on February 28, 1994, March 14, 1994, March 28, 1994, May 9, 1994, and May 23, 1994 also mentioned that the FTC was considering bringing a formal complaint against Red Apple regarding the Sloan's supermarkets acquisition. *See* Honig Aff., Ex. E–13, 14, 15, 16, and 17. The articles appearing in FTC:WATCH, however, do not make any mention of the FTC investigation of the eleven supermarket acquisition by defendant Sloan's. *See id.*

Aware of the FTC investigation since its initial stages, from 1991 to 1994, Catsimatidis and his attorneys engaged in discussions with the FTC concerning the possible divestiture of certain Sloan's supermarkets by defendant Sloan's and Red Apple. *See* Pl. 56.1 S. at ¶¶ 8, 10, and 11; Def. 56.1 S. at ¶ 8. In addition, from September 1993 through May of 1994, Catsimatidis and defendant Sloan's engaged in negotiations with the FTC, in which the FTC clearly stated that defendant Sloan's was the target of its inquiry, and demanding divestiture of certain Sloan's supermarkets. *See* Pl. 56.1 S. at ¶ 11.

Nevertheless, between February 28, 1993 and January 14, 1994, defendant Sloan's communicated with its shareholders and made a number of SEC filings without ever disclosing the existence of the ongoing FTC investigation. *See* Complaint at ¶¶ 16–21 (noting that defendant Sloan's failed to disclose the FTC investigation in SEC filings on February 28, 1993, April 9, 1993, August 18, 1993, October 11, 1993, and January 14, 1994). In particular, defendant Sloan's (under its former name Designcraft), in its annual report to shareholders as of February 28, 1993, not only failed to disclose the investigation, but stated that Sloan's would "continue to actively seek additional businesses, preferably within the food industry." Sloan's February 28, 1993 Annual Report, attached as Ex. D–3 to Honig Aff.

Defendant Sloan's, whose stock trades on the American Stock Exchange ("AMEX"), has 2,397,605 issued and outstanding shares that are owned by over 320 stockholders apart from Catsimatidis. During the period from November 18, 1993 through December 21, 1993, RMED acquired, in public trade, 226,000 shares of defendant Sloan's stock, or roughly 10% of the outstanding shares, at prices ranging from $7.75 to $11.25 per share. *See* Com-

---

**9.** The defendants have not offered any evidence of the circulation or readership of the FTC:WATCH publication.

plaint at ¶ 23. RMED sold almost all of these shares between December 29, 1993 and July 29, 1994. *See* Complaint at ¶ 24. On May 26, 1994, the day before the issuance of the FTC complaint, Sloan's stock was trading at $6.13 per share. On June 1, 1994, the day before the public announcement of the FTC complaint, the price of the stock had fallen to $5.75 share, and, on July 18, 1994, the price had fallen to $4.00 share. *See* Complaint at ¶ 28.

### B. *Procedural Background*

Plaintiffs allege that defendants' violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10(b) promulgated thereunder by (1) failing to disclose the existence of the FTC investigation until June 2, 1994; (2) falsely stating that defendant Sloan's would seek to acquire additional business in the food industry; and (3) failing to disclose the possibility that defendant Sloan's would be divested of some of its supermarkets or would be restricted from acquiring supermarkets.

Defendants previously moved to dismiss the complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the federal causes of action should be dismissed for failure to plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure, and that the supplemental state claims should consequently be dismissed for lack of subject matter jurisdiction. In a Memorandum Order filed March 3, 1995, this Court denied defendants' motion in its entirety. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 878 F.Supp. 16, 17 (S.D.N.Y.1995). On March 25, 1996, this Court ruled that the action could proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying the class of persons who purchased shares of defendant Sloan's stock during the period from January 7, 1993 to June 2, 1994, inclusive. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 1996 WL 134757 (S.D.N.Y. March 25, 1996).

On April 18, 2000, this Court affirmed Magistrate Judge Ronald L. Ellis's decision rejecting the defendants' motion to exclude the testimony of plaintiffs' damages expert, Candace L. Preston. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 420548 (S.D.N.Y. April 18, 2000) (Leisure, J.); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 310352 (S.D.N.Y. March 24, 2000) (Ellis, Mag. J.). The defendants now move for summary judgment.

### DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> .　　　.　　　.　　　.　　　.
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5, promulgated by the Securities and Exchange Commission ("SEC") under Section 10(b) of the Securities Ex-

change Act of 1934, states in pertinent part:

It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange, . . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ Therefore, to state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must show that the plaintiff made a false statement or omitted a material fact in connection with the purchase or sale of securities, with scienter, and that the plaintiff's reliance on defendant's action caused the plaintiff injury. *See Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996)); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir.2000).

Defendants make four principal arguments in support of their motion for summary judgment: (1) their alleged misstatements and omissions regarding the ongoing FTC investigation were not material; (2) the FTC investigation was disclosed in newspapers and publications available in the market; (3) the defendants didn't have the requisite scienter to violate Rule 10b–5; and (4) Sloan's stock was not traded in an open and developed market, preventing plaintiffs from the presumed reliance inherent in plaintiffs' "fraud on the market" theory, and therefore requiring the plaintiffs to show that each individual plaintiff relied on the de-

fendants' representations. The defendants also argue that the plaintiffs' pendent state law claims should be dismissed. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs' Mem."), at 2–4. The Court will address the standard for summary judgment, and then turn to each of the defendants' arguments.

## I. Summary Judgment Standard

A moving party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Holt v. KMI–Continental Inc.*, 95 F.3d 123, 128 (2d Cir.1996). When considering a motion for summary judgment, the Court's responsibility is not "to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986).

In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holt*, 95 F.3d at 129. The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gallo v. Prudential Residential Serv. L.P.*, 22 F.3d 1219, 1223–24 (2d Cir.1994). "[T]he movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving par-

ty's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). Once the moving party discharges his burden of demonstrating that no genuine issue of material fact exists, the burden shifts to the nonmoving party to offer specific evidence showing that a genuine issue for trial exists. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Continental Group*, 859 F.2d 1108, 1114 (2d Cir.1988) (quoting *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505).

## II. Materiality

Defendants join in arguing that their alleged misstatements and omissions were immaterial as a matter of law. In support, the defendants posit that the FTC investigation was not material because its disclosure would not have altered the total mix of information available to the investing public. *See* Defs' Mem. at 2. Further, defendants argue that the information that the plaintiffs claim should have been disclosed did not exist at the time of the defendants' statements. *See id.*

█ As stated previously, Section 10(b) is one of the provisions of the Securities Exchange Act of 1934 ("1934 Act"). The 1934 Act was designed to protect investors from the manipulation of stock prices. *See Basic Inc. v. Levinson*, 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." *Id.* (quoting

HR Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934)). The fundamental purpose of the 1934 Act is to implement a "philosophy of full disclosure." *Basic*, 485 U.S. at 230, 108 S.Ct. 978 (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)); *see also Ganino*, 228 F.3d at 161 (noting that Section 10(b) prohibits conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive") (quoting *Field v. Trump*, 850 F.2d 938, 946–47 (2d Cir.1988)).

█ In order to satisfy the materiality requirement of Rule 10b–5, there must exist a substantial likelihood that a reasonable investor would consider the information important in his decision-making process. *See Basic*, 485 U.S. at 231, 108 S.Ct. 978 (adopting the standard set out in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for Section 10(b) and Rule 10b–5 actions); *Ganino*, 228 F.3d at 161–62. In other words, there must exist a substantial likelihood that the "omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). Although the misstated or omitted fact must have been one that would have assumed actual significance in the reasonable shareholder's decision-making process, there is no requirement that the fact would have been outcome determinative. Thus, a fact may be material even if it would not have changed an investor's ultimate decision. *See Ganino*, 228 F.3d at 162; *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 409 (S.D.N.Y.1998).

An omitted fact may be immaterial if the information is trivial, or is "so basic that any investor could be expected to know it." *Ganino,* 228 F.3d at 162 (quoting *Levitin v. PaineWebber, Inc.,* 159 F.3d 698, 702 (2d Cir.1998)). Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all of the relevant circumstances of the case, and materiality is a mixed question of both law and fact. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126; *Ganino,* 228 F.3d at 163. Because the determination of materiality involves factual determinations, the Supreme Court has noted that materiality is particularly well suited for jury determination. *See TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126. "The determination requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly one for the trier of fact." *Id.; see also Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (noting that the determination of whether information is material is "a mixed question of law and fact that generally should be presented to a jury.") Thus, summary judgment is only appropriate in a 10b–5 action on the grounds of immateriality where the alleged misstatements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Kidder Peabody,* 10 F.Supp.2d at 409 (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994)).

Profit statements and financial reports are of particular interest to investors. *See In re Quintel Secs. Litig.,* 72 F.Supp.2d 283, 294 (S.D.N.Y.1999); *Kidder Peabody,* 10 F.Supp.2d at 410; *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 n. 9 (3d Cir.1997) ("Indeed, earnings reports are among the pieces of data that investors find most relevant to the investment decision."). The *Quintel* Court found that alleged misstatements and omissions in Form 10–Q, a financial report filed with the SEC, could be material. 72 F.Supp.2d at 294. Similarly, in the summary judgment context, the *Kidder Peabody* Court found that alleged misstatements and omissions in financial reports filed with the SEC raised issues of fact regarding materiality which should be decided by a jury. 10 F.Supp.2d at 409–10.

The possibility of a merger has been found to be material, even if the merger is not consummated. *See In re Columbia Secs. Litig.,* 155 F.R.D. 466, 483–84 (S.D.N.Y.1994) (citing *Basic,* 485 U.S. at 238, 108 S.Ct. 978). "[T]he mere possibility of a merger may have significance for investors; whether or not a merger eventually takes place." *Columbia,* 155 F.R.D. at 483–84. In addition, the Second Circuit has found the possibility of antitrust problems which might stymie a deal to be material information in the context of Section 14(e) of the Securities Exchange Act of 1934, a rule that deals with tender offers and bears obvious similarity to Section 10(b) and Rule 10b–5 promulgated thereunder.[10] *See Gulf & Western Indus., Inc.*

---

10. Section 14(e) of the Securities Exchange Act of 1934 provides:

e) Untrue statement of material fact or omission of fact with respect to tender offer It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commis-

*v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 697 (2d Cir.1973); *see also In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712, 729 ("Certainly, the possibility of antitrust problems that might make the deal illegal is a material fact which must be disclosed.").

In *Gulf & Western,* the Second Circuit considered the district court's decision to grant the Great Atlantic & Pacific Tea Company ("A & P") a preliminary injunction enjoining Gulf & Western Industries, Inc. ("G & W") from consummation of a tender offer to purchase 3,750,000 shares, or approximately 15%, of A & P's common stock. *See* 476 F.2d at 689–90. The Court upheld the preliminary injunction, concluding that G & W had had failed to disclose that due to G & W's holdings in other companies, G & W's acquisition was likely to result in violations of the antitrust laws for both G & W and A & P. *See id.* at 695–97. Noting that Section 14(e) in general tracks the language of Rule 10b–5, except that 14(e) "applies to tender offers rather than the purchase or sale of securities," the *Gulf Western* court found it probable that A & P would prevail at trial. *Id.* at 695–96. The Second Circuit found:

> It also appears that G & W omitted to state certain material facts indicating that there are substantial antitrust obstacles to G & W's purchasing a large portion of A & P's shares.... The facts that, at the time it announced its tender offer, an antitrust action had not been commenced against G & W, and that its liability was uncertain, does not excuse G & W's failure to disclose all these relevant circumstances so that A & P shareholders could weigh them in reach-

ing their decision whether or not to tender their shares.

*Id.* at 697.

 In the present case, plaintiffs have put forth sufficient evidence for a reasonable jury to conclude that the defendants' non-disclosure of the FTC investigation, in a number of public filings, constituted repeated misstatements, or omissions, of a material fact. Further, a jury could reasonably find that the defendant Sloan's February 23, 1993 Annual Report, which stated that Sloan's would "actively seek additional businesses, preferably within the food industry," constituted a misstatement of a material fact. *See supra,* Background at 9.

Defendants' argue that Sloan's did not make material misstatements or omissions in their SEC filings, because Sloan's was not a target of the FTC investigation until September 1993. *See* Defs' Mem. at 26. This argument fails for purposes of the instant summary judgment motion. The plaintiffs have offered evidence that defendant Catsimatidis and his attorneys engaged in discussions with the FTC regarding divestment of Sloan's supermarkets by both Sloan's and Red Apple. *See supra,* Background at 8. Indeed, as early as September 1992, while considering the eleven supermarket acquisition by defendant Sloan's, the defendants had their attorneys research the antitrust implications of such an acquisition. *See* Plaintiff's 56.1 Counter Statement of Facts ("Pl. 56.1 Counter S."), at ¶ 19. The board of directors of defendant Sloan's, while considering the acquisition at a December 10, 1992 meeting, determined that it would be necessary to review legal counsel's research regarding the antitrust implications before approving

---

sion shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to

prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. 78n(e).

the planned acquisition. *See* Pl 56.1 Counter S. at ¶ 20.

Moreover, defendant Sloan's was formally put on notice that its acquisition of eleven supermarkets was being investigated by the FTC for possible antitrust violations in September of 1993, when the FTC called an attorney representing Sloan's. *See* Pl. 56.1 Counter S. at ¶ 30. Between September 1993 and May 1994, the FTC sought divestiture of certain supermarkets by defendant Sloan's. *See supra*, Background at 8. Yet, three SEC filings before September 1993, and two after, failed to reveal any potential antitrust violations related to the Sloan's acquisition. *See supra*, Background at p. 8 (noting that Sloan's failed to disclose the FTC investigation in SEC filings in February, April, August, and October 1993, as well as January, 1994).

Defendants also argue that disclosure of the FTC investigation was not material, because its disclosure would not have altered the total mix of information available to the investing public. *See* Defs' Mem. at 24. Courts have noted that the mere possibility of a merger is material, though, even if the merger never occurs. *See Columbia*, 155 F.R.D. at 483–84 (citing *Basic*, 485 U.S. at 238, 108 S.Ct. 978). In the instant action, Sloan's had made a deal to acquire eleven supermarkets. Unbeknownst to shareholders, however, this acquisition was threatened by antitrust problems, and was the subject of an FTC investigation. *See supra*, Background at 8. As noted above, the Second Circuit has found potential antitrust problems material under Section 14(e) of the Securities Exchange Act. *See Gulf & Western*, 476 F.2d at 697. Thus, for the purposes of this motion, the Court finds that disclosure of the FTC investigation of defendant Sloan's was material.

Therefore, the Court denies the defendants' summary judgment motion on the basis of immateriality.

### III. Disclosure

Defendants argue that they did not make any actionable misstatements or omissions, because the FTC investigation was disclosed by newspapers and periodicals in the public domain during the relevant time period. *See* Defs' Mem. at 2. In essence, the defendants make a second attack on the materiality of the FTC investigation of defendant Sloan's, arguing that the investing public was informed of the FTC investigation contemporaneously by newspapers and periodicals, and thus any statement by the defendants acknowledging the FTC investigation would not have altered the total mix of information available. *See Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (noting that an omitted fact is material if it would have been viewed by the reasonable investor as significantly altering the total mix of information available).

The Court rejects this argument as well. Although FTC:WATCH published several articles that discussed the FTC investigation of Red Apple, none of these articles mention any FTC investigation of the defendant Sloan's. *See supra*, Background at 7–8. This is the very information which the plaintiffs claim should have been revealed to them, and the Court is convinced that there remains a genuine issue of material fact as to whether the defendants' alleged misstatements and omissions were material. Further, defendants have offered no evidence that FTC:WATCH was a widely circulated publication with which the investing public would be familiar. Therefore, the Court denies defendants' summary judgment motion on this basis.

## IV. Scienter

Defendants have also argued that they did not act with the scienter necessary to be found liable under Rule 10b–5. *See* Defendant's Defs' Mem. Motion at 2. In a Rule 10b–5 action, the requisite state of mind, or scienter, is "an intent to deceive, manipulate or defraud." *Kalnit,* 264 F.3d at 138 (citations omitted); *see Press v. Chemical Investment Servs. Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999). A plaintiff may prove scienter by showing that (1) the defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit,* 264 F.3d at 138–39; *Press,* 166 F.3d at 538. The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment, even when the inferences are fairly tenuous. *See Press,* 166 F.3d at 538 (citing *In re Time Warner,* 9 F.3d 259, 270–71 (2d Cir.1993)). Moreover, scienter is a question of fact, and therefore "appropriate for resolution by the trier of fact." *Press,* 166 F.3d at 538; *see Wechsler v. Steinberg,* 733 F.2d 1054, 1058–59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."); *Kidder Peabody,* 10 F.Supp.2d at 415 ("Whether a plaintiff can establish scienter usually cannot be decided on summary judgment."); *Columbia,* 155 F.R.D. at 479 ("Resolution of the question of scienter, as with any issue of motive or intent, generally requires examination of a witness's demeanor and credibility and is thus usually inappropriate for disposition on summary judgment.").

Drawing all inferences in the plaintiffs' favor, the Court rejects the defendants' motion for summary judgment on the basis of lack of scienter. The plaintiffs have presented evidence sufficient to establish that defendants had a motive to commit fraud and had an opportunity to do so. Defendant Catsimatidis, for the entire period of the FTC investigation, was the president and sole shareholder of Red Apple. He was also chairman of the board, chief executive officer, treasurer, and 37% shareholder of Sloan's. *See supra,* Background at 2–3. In these capacities, Catsimatidis had control over and intimate knowledge of Sloan's business. Even though, as defendants argue, Sloan's may have been unable to predict the exact outcome of the FTC investigation, the plaintiffs have presented evidence sufficient for a reasonable jury to conclude that Catsimatidis knew that Sloan's was in danger of being ordered to divest certain supermarkets in the New York City area. *See supra,* Background at 8. Thus, for purposes of the instant motion, the plaintiffs have demonstrated that Catsimatidis and Sloan's had a motive to maintain Sloan's appearance of financial health to both its existing shareholders and its potential investors. Furthermore, by failing to disclose the existence of the FTC investigation both in SEC filings and in communications to shareholders, Catsimatidis and Sloan's had the opportunity to commit the alleged fraud.

Even if plaintiffs could not show that defendants had the motive and opportunity to commit fraud, the plaintiffs have also offered evidence that gives rise to a strong inference of recklessness or conscious misbehavior. To wit, plaintiffs have offered evidence that the defendants knew of the FTC investigation of defendant Sloan's, that defendants repeatedly misrepresented and omitted this information in SEC filings, and that Catsimatidis, who was the 37% owner, CEO and chairman of the board of defendant Sloan's, had an interest in maintaining the appearance that defendant Sloan's prospects were healthy. *See supra,* Background at 2–3, 8. These facts

provide circumstantial evidence of recklessness. *See Kalnit,* 264 F.3d at 138–39; *see also Winkler v. NRD Mining Ltd.,* No. 83 Civ. 3318, 1988 WL 16176, at *1 (E.D.N.Y. Feb. 22, 1988) (holding that allegations that a press release and annual report issued by defendants were false and misleading constituted sufficient evidence of scienter to overcome a motion for summary judgment).

The defendants contend that the alleged facts do not give rise to an inference that they acted with conscious misbehavior or recklessness. They assert that there is nothing to indicate that Sloan's was affected by the resolution of the FTC complaint because the FTC simply sought divestiture of some stores by either Red Apple or Sloan's. *See* Defs' Mem. at 27–28. The Court finds this argument unpersuasive, because the actual impact of the FTC Complaint does not relate to defendants' scienter at the time of the alleged Rule 10b–5 violations. Therefore, the Court denies the defendants' summary judgment motion on the basis of scienter.

## V. The efficiency of the market for Sloan's stock

The plaintiffs proceed under a "fraud on the market" theory, under which they need not prove reliance by each individual plaintiff on the alleged misstatements and omissions made by the defendants. The defendants argue that the market for Sloan's shares, which were traded on the AMEX, was not an open and efficient market, and that therefore the plaintiffs cannot avail themselves of the benefits of the "fraud on the market" theory, and must prove reliance by each individual plaintiff. *See* Defs' Mem. at 3.

The "fraud on the market" theory posits that in an open and developed securities market, the price of a company's stock is determined by publicly available material information about the company. In such a situation, misleading statements can affect the price of the company's stock, thus defrauding purchasers of the stock even if they do not rely on the misstatements. *See Basic,* 485 U.S. at 241–42, 108 S.Ct. 978; *Quintel,* 72 F.Supp.2d at 297; *Columbia,* 155 F.R.D. at 480. As the Supreme Court explained in *Basic:* "An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action." 485 U.S. at 247, 108 S.Ct. 978. Therefore, in a case involving plaintiffs who purchased their shares in an efficient market, the "fraud on the market" theory affords the plaintiffs a rebuttable presumption of reliance. *See id.; Quintel,* 72 F.Supp.2d at 297.

Although the defendants argue that the market for Sloan's stock was not an open and efficient market, they have offered no cases where a court has determined that a stock traded on the AMEX was not considered to have been traded in an open and efficient market. *See* Defs' Mem. at 30–34. Indeed, research has failed to reveal any case where a stock traded on the AMEX was found not to have been traded in an open and efficient market. *See, e.g., Miller v. NTN Comm.,* No. 97 Civ. 1116, 1999 WL 817217, at *10 (S.D.Cal. May 21, 1999) ("While the court acknowledges that trading on the AMEX, standing alone, is not sufficient to establish an efficient market it appears no court has ever found that a stock trading on the AMEX was inefficient for purposes of applying the fraud-on-the-market presumption."). Rather, to the contrary, numerous courts have held that stocks trading on the AMEX are al-

most always entitled to the presumption. *See, e.g., Peil v. Speiser,* 806 F.2d 1154, 1158 (3d Cir.1986); *Miller,* 1999 WL 817217, at *10: *Cammer v. Bloom,* 711 F.Supp. 1264, 1292 (D.N.J.1989).

The defendants have further argued that the movement of Sloan's stock during the relevant time period demonstrates that the stock did not trade in a developed and efficient market, because the stock price fell in advance of the day when Sloan's revealed the existence of the FTC Complaint. *See* Defs' Mem. at 33–34. But as Magistrate Judge Ellis noted in rejecting the defendants' motion to exclude the testimony of the plaintiffs' damages expert:

> Defendants' alleged misrepresentations and omissions were not revealed to the market in a single clean announcement. Rather, Sloan's stock price declined gradually from December 1993 until June 1994, as Sloan's investors realized that the announced acquisitions of additional supermarkets were not materializing.... Under such circumstances, where the fraud either leaks into or becomes apparent to the market slowly over time ... by the time of the full revelation of the fraud, the market price already reflects some or all of the information contained in the announcement.

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* No. 94 Civ. 5587, 2000 WL 310352, at *8 (S.D.N.Y. March 24, 2000); *see RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* No. 94 Civ. 5587, 2000 WL 420548 (S.D.N.Y. April 18, 2000) (Leisure, J.) (affirming Magistrate Judge Ellis's opinion).

■ The Court is not persuaded by the defendants' arguments with regard to the efficiency of the market for Sloan's stock. Sloan's stock is traded on the AMEX, a market which has always been found efficient. Further, the Court finds that there is a plausible explanation as to why the price of Sloan's stock did not immediately drop following the announcement of the FTC complaint. Therefore, the Court denies the defendants' summary judgment motion on this basis, and finds that the plaintiffs can proceed under a "fraud on the market" theory, and need not prove individual reliance by each plaintiff.[11]

## VI. Plaintiffs' State Law Claims

The defendants' seek summary judgment regarding the plaintiffs' state law claims, arguing that if the plaintiffs' federal claims are dismissed, there is no jurisdiction to support these state claims. *See* Defs' Mem. at 3–4. The plaintiffs bring state law claims under Article 23–A of the General Business Law of New York, as well as actions for both fraud and a breach of fiduciary duties owed to the plaintiffs under state common law. This Court, having now denied defendants' motion for summary judgment regarding the federal claims, also denies defendants' motion for summary judgment as to the state claims for lack of jurisdiction.

■ The defendants further argue that the plaintiffs should be precluded from bringing a claim for common law fraud, because the plaintiffs have failed to show a proximate causal connection between the wrongdoing alleged and the damages

---

11. The Court notes that there is further authority supporting the plaintiffs' position that they need not prove reliance in this case, at least with regard to the alleged material omissions made by the defendants. When claiming that a defendant has made a material omission, " 'positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material ...' " *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992) (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)); *see Benjamin v. Kim,* No. 95 Civ. 9597, 1999 WL 249706, at *10 (S.D.N.Y. April 28, 1999).

claimed. *See* Defs' Mem. at 37 (citing *Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 403 (S.D.N.Y.1976)). The Court finds that there is a genuine issue of material fact as to whether the defendants' alleged misstatements were the proximate cause of the defendants' losses, and thus the Court rejects this argument.

Defendants also argue that plaintiffs lack standing to bring a private cause of action under the Martin Act, which is codified in Article 23–A of New York's General Business Law. *See* Defs' Mem. at 38. The Martin Act governs fraud and deception in the sale of securities, and it provides for enforcement by the attorney general. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F.Supp.2d 275, 291 (S.D.N.Y.1998). It is beyond cavil that there is no private right of action for claims that are within the Martin Act. *See id.; CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987); *Rego Park Gardens Owners v. Rego Park Gardens Assocs.*, 191 A.D.2d 621, 595 N.Y.S.2d 492 (2d Dep't 1993). Therefore, the Court grants the defendants' motion for summary judgment as to the plaintiffs' claims under Article 23–A of New York's General Business Law.

Defendants also seek dismissal of plaintiffs' claim for breach of fiduciary duty on the ground that such a claim is derivative in nature, and not personal. *See* Defs' Mem. at 38–39. New York courts have found that a shareholder has no standing to file suit for a wrong committed against a corporation. *See Abrams v. Donati*, 66 N.Y.2d 951, 498 N.Y.S.2d 782, 489 N.E.2d 751 (1985); *Elenson v. Wax*, 215 A.D.2d 429, 626 N.Y.S.2d 531, 531 (2d Dep't 1995) *see also Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.*, 964 F.Supp. 783, 791 (S.D.N.Y.1997) (applying Maryland corporation law); *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (1996) (applying Delaware corporation law). Even if a stockholder has been injured by a diminution in the value of his shares, he can not proceed individually, but rather must bring a shareholder derivative action. *See Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991) (Newman, J.); *Heil v. Lebow*, No. 91 Civ. 8656, 1993 WL 15032, at *3 (S.D.N.Y. Jan. 13, 1993) (Keenan, J.); *Press v. Marvalan Indus.*, 468 F.Supp. 1072, 1078 (S.D.N.Y.1979) (citing *Berzin v. Litton Indus.*, 24 A.D.2d 740, 263 N.Y.S.2d 485 (1st Dep't 1965)). In the instant case, plaintiffs have never alleged, or even suggested, that they attempt to bring a shareholder derivative action. Thus, because the plaintiffs have not brought a shareholder derivative action, the defendants' motion for summary judgment as to the plaintiffs' breach of fiduciary duty claim is granted.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is HEREBY GRANTED with respect to plaintiffs' state law claim under Article 23–A of the General Business Law of New York, and for plaintiffs' claim of breach of fiduciary duty, and DENIED with respect to the plaintiffs' claim under Section 10(b) of Securities Exchange Act, and Rule 10b–5 promulgated thereunder, as well as plaintiffs' claim of fraud under state common law. The parties are ordered to appear before this Court at the United States Courthouse, 500 Pearl Street, Courtroom 18B, New York, New York, on March 4, 2002, at 11:30 a.m. for a pre-trial conference.

**SO ORDERED**.